Reversed and Rendered in Part and Opinion filed February 19, 2004









Reversed and Rendered in Part and Opinion filed February 19, 2004.

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-02-00709-CV

____________

 

ELAND ENERGY, INC., Appellant

 

V.

 

SEAGULL ENERGY
E&P, INC.,
Appellee

 



 

On Appeal from the 127th
District Court

Harris County, Texas

Trial Court Cause No. 99-03508

 



 

O P I N I O N

In this breach-of-contract case, we decide
whether certain oil and gas operating agreements impose liability on former
working-interest owners to reimburse the operator for costs paid by the
operator after the former working-interest owner assigned its entire interest
to a third party.  Under the unambiguous
language of the agreements in question, we find no such liability.  Therefore, we reverse the trial court=s judgment to the
extent it awards damages against appellant/defendant Eland Energy, Inc., and we
render judgment that appellee/plaintiff Seagull Energy E&P, Inc. take
nothing.








                         I. Factual and Procedural Background

Seagull Energy E&P, Inc. (hereafter,
the AOperator@) is the
designated operator in operating agreements relating to two oil and gas leases
of submerged lands on the Outer Continental Shelf off the coast of Texas.  After the working-interest owners in these
two leases entered into operating agreements regarding operations on each
respective lease,  Eland Energy, Inc.
acquired a working interest in both leases (collectively referred to herein as AWorking Interests@).  As part of the assignment of the Working
Interests to Eland, Eland agreed to assume and be liable for a proportionate
part of the obligations created by the existing offshore operating agreements
pertaining to each interest.  

Less than two years after obtaining title
to the Working Interests, Eland decided to have these interests sold at an
auction that required no minimum bid.  In
this auction, Nor-Tex Gas Corporation was the successful bidder, and under the
terms of the auction, Eland (hereafter, the AAssignor@) assigned the
Working Interests to Nor-Tex (hereafter, the AAssignee@), which paid $500
for each as consideration for the assignments. 
As part of these assignments, the Assignee agreed to assume and be
liable for a proportionate part of the obligations created by the existing
offshore operating agreements pertaining to each of the Working Interests.  The trial court determined that the Assignor
validly assigned the Working Interests to the Assignee, and the Operator does
not contend otherwise on appeal.

The Assignee defaulted in its obligations
under the operating agreements by failing to reimburse the Operator for its
share of the costs relating to the Working Interests.  The Assignee eventually filed for bankruptcy
under Chapter 7 of the United States Bankruptcy Code.  After the Assignee=s default, the
Operator demanded reimbursement from the Assignor.  While the Assignor owned the Working
Interests, it reimbursed the Operator for its share of the operator-incurred
costs; however, the Assignor refused to reimburse the Operator for costs
incurred after it assigned the Working Interests to the Assignee.  








The Operator asserted breach-of-contract
claims against the Assignor and the Assignee and sought reimbursement as to
costs incurred after the Assignor assigned the Working Interests to the
Assignee.  The Operator filed a motion
for summary judgment, arguing that the Assignor and the Assignee were jointly
and severally liable as a matter of law for breach of the offshore operating
agreements relating to the Working Interests. 
As to the Assignor, the Operator asserted (1) the Assignor was a party
to these operating agreements; (2) the Assignor therefore was required to
reimburse the Operator even after it assigned the Working Interests; and (3)
the Assignor=s assignment of the Working Interests did
not affect the Assignor=s liability under the operating
agreements.  

The Assignor opposed the Operator=s summary-judgment
motion and filed its own motion for partial summary judgment, asserting that,
under the unambiguous language of the operating agreements, the Assignor did
not have any contractual obligation to reimburse the Operator for costs
incurred after the Assignor assigned the Working Interests.  

The trial court granted the Operator=s motion and
denied the Assignor=s motion. 
In its interlocutory summary-judgment order, the trial court ruled: (1)
the Assignee is liable to the Operator for breach of the operating agreements;
(2) although the Assignor assigned the Working Interests to the Assignee, as a
matter of law, the Assignor remains liable for performance of its obligations
under the operating agreements; and (3) the Assignor breached the  operating agreements by failing to reimburse
the Operator for the proportionate share of costs relating to the Working Interests
after the Assignor assigned these interests to the Assignee.








After a bench trial on the remaining
issues, the trial court signed a final judgment that incorporated the court=s prior
summary-judgment rulings and that made the following additional rulings:  (1) the Assignor  and the Assignee are jointly and severally
liable to the Operator for $268,418.99, plus prejudgment interest, postjudgment
interest, costs, and attorney=s fees; and (2)
based on the Assignor=s cross-action against the Assignee, the
Assignee must indemnify the Assignor for all of the amounts awarded the
Operator against the Assignor in the judgment. 
The trial court made findings of fact and conclusions of law stating,
among others things, that the actual damages awarded the Operator fairly and
reasonably compensate the Operator for the failure of the Assignor and the
Assignee to comply with the operating agreements.  

                                             II.
Issue Presented

On appeal, the Assignor asserts, among
other things, that the trial court erred in granting the Operator=s motion for
summary judgment and in denying the Assignor=s motion for
partial summary judgment.  The Assignor
argues that the trial court erred by holding it liable under the operating
agreements for costs incurred by the Operator after the Assignor assigned the
Working Interests to the Assignee.  The
Assignor asserts that, under the unambiguous language of the operating
agreements, it owed no such contractual obligation to the Operator.  

                                         III. Standard of Review








The Assignor asks this court to review the
trial court=s denial of its motion for partial summary
judgment; however, because this motion did not seek a final judgment, we cannot
review the trial court=s denial of the motion.  See CU Lloyd=s of Texas v.
Feldman, 977 S.W.2d 568, 569 (Tex.1998); General Res. Org., Inc. v. Deadman,
907 S.W.2d 22, 28 (Tex. App.CCorpus Christi
1995, writ denied) (holding appellate court cannot review trial court=s denial of motion
for summary judgment after trial on the merits). In reviewing the trial court=s summary judgment
that holds the Assignor liable as a matter of law under the operating agreements,
we must determine whether the Operator showed there is no genuine issue of
material fact and that it is entitled to judgment as a matter of law.  See KPMG Peat Marwick v. Harrison County
Housing Fin. Corp., 988 S.W.2d 746, 748 (Tex.1999).  In conducting our review, we take as true all
evidence favorable to the non-movant (Assignor), and we make all reasonable
inferences in its favor.  See id.  The Operator is entitled to summary judgment
if it pleaded and conclusively established each element of its
breach-of-contract claim.  See Science
Spectrum, Inc. v. Martinez, 941 S.W.2d 910, 911 (Tex. 1997).

                                                    IV. Analysis

Did the Assignor have an obligation under the operating
agreements to pay the Operator a share of the operator-incurred costs and
expenses after the Assignor assigned the Working Interests?

In its first issue, the Assignor argues
the trial court erred by holding it liable under the operating agreements
because, under the unambiguous language of these contracts, the Assignor had no
obligation to reimburse the Operator for costs or expenses incurred after the
Assignor assigned the Working Interests to the Assignee.  In construing these operating agreements, our
primary concern is to ascertain and give effect to the intentions of the
parties as expressed in the contracts.  Kelley‑Coppedge,
Inc. v. Highlands Ins. Co., 980 S.W.2d 462, 464 (Tex. 1998).  To ascertain the true intentions of the
parties to the contract, we examine the entire agreement in an effort to
harmonize and give effect to all of the provisions of the contract so that none
will be rendered meaningless.  MCI
Telecommunications Corp. v. Texas Utilities Elec. Co., 995 S.W.2d 647, 652
(Tex. 1999).  When a written contract is
so worded that it can be given a certain or definite legal meaning or
interpretation, it is not ambiguous, and courts may construe it as a matter of
law.  American Manufacturers Mut. Ins.
Co. v. Schaefer, C S.W.3d C, C, No. 02-0295,
2003 WL 22417186, at *2 (Tex. Oct. 17, 2003).








Whether a contract is ambiguous is a
question of law for the court. Heritage Res., Inc. v. NationsBank, 939
S.W.2d 118, 121 (Tex. 1996).  A contract
is ambiguous when its meaning is uncertain and doubtful or is reasonably
susceptible to more than one interpretation. 
Id.  We cannot rewrite the
operating agreements or add to their language under the guise of
interpretation.  See American
Manufacturers Mut. Ins. Co., C S.W.3d at C, 2003 WL
22417186, at *6 (stating Awe may neither rewrite the parties= contract nor add
to its language@). 
Rather, we must enforce the operating agreements as written.  See Royal Indem. Co. v. Marshall, 388
S.W.2d 176, 181 (Tex. 1965).  

In the APurchase and Sale
Agreement@ with other parties, under which the
Assignor originally obtained the Working Interests, the Assignor agreed to the
following terms:

On the Closing Date, ownership of
all production attributable to the Properties conveyed to [Assignor/Eland] and
all other attributes of ownership, including liabilities and obligations
arising after the Effective Date or assumed hereunder, shall pass as of the
Effective Date.

[Assignor/Eland] shall assume all
liability and obligation for acquiring and ensuring compliance with all
permits, licenses, and other authorizations which are required under federal,
state and local laws with respect to pollution or protection of the environment
relating to the Properties . . . .

[Assignor/Eland],
as owner of the Properties acquired on the Closing Date, shall, by consummation
of the transactions contemplated by this Agreement, obligate itself to assume
and timely discharge all duties, obligations and liabilities of the owner of
the Properties . . . .

Both assignments by which the
Assignor/Eland originally obtained the Working Interests state:

It is understood
and agreed by the parties hereto that this Assignment is made subject to [the
applicable offshore operating agreement] and [Assignor/Eland] agrees to assume
and be liable for a proportionate part of the obligations created [by the
applicable offshore operating agreement] . . . .  

The Assignor/Eland does not dispute that
it assumed liability as a party under the operating agreements; however, it
claims that these operating agreements do not create any contractual obligation
for a former working-interest owner to reimburse the Operator for costs paid by
the Operator after the former working-interest owner has assigned its entire
interest to a third party.  The language
of each applicable offshore operating agreement is substantially similar
regarding this issue.  Both agreements
contain the following language:








                                                    DEFINITIONS

. . .

2.10   Participating Interest.  The respective percentage of
participation  of each Party electing to
participate in each of the operations conducted hereunder, including the
production of Oil and Gas, based on ownership in the Lease.

. . .

8.1     Basis of Charge to the Parties.  Operator shall pay all costs and each Party
shall reimburse Operator in proportion to its Participating Interest.

. . .

8.6     Unpaid Charges.  If any Party fails to pay the charges due
hereunder within sixty (60) days after rendition of Operator=s statement, the other
Participating Parties shall, upon Operator=s request, pay the unpaid amount in proportion to their
interests.  Each Party so paying its
share of the unpaid amount shall be subrogated to Operator=s security rights to the extent of
such payment.  

8.7     Default.  If any Party does not pay its share of the
charges when due, Operator may give such Party notice that unless payment is
made within fifteen (15) days, such Party shall be in default.  Any Party in default shall have no further
access to the maps, records, data, interpretations, or other information
obtained in connection with operations. 
A defaulting Party shall not be entitled to vote on any matter until
such time as said Party=s payments are current.  The voting interest of each non-defaulting
Party shall be in the proportion its Participating Interest bears to the total
non-defaulting Participating Interest. 
As to any operation approved during the time a Party is in default, such
Party shall be deemed to be a Non-participating [sic] Party.

. . .








14.1   Platform Salvage and Removal Costs.  When the Parties owning a platform mutually
agree to dispose of such platform, it shall be disposed of by the Operator as
approved by such Parties.  The costs,
risks, and net proceeds, if any, resulting from such disposition shall be
shared by such Parties in proportion to their Participating Interests.

. . .

14.4   Abandonment Operations Required by
Governmental Authority.  Any well
abandonment or platform removal required by governmental authority shall be
accomplished by Operator with the costs, risks, and net proceeds, if any, to be
shared by the Parties owning such well or platform in proportion to their
Participating Interests.

. . .

15.1   Withdrawal.  A Party may withdraw from this Agreement as
to a Lease by assigning, to the other Parties who do not desire to withdraw,
all its interest in such Lease and the wells, platforms and Facilities used in
operations on such Lease . . . . The assignees, in proportion to the respective
interests so acquired, shall pay the assignor for its interest in the wells,
platforms and Facilities, the current salvage value thereof less its share of
the estimated current cost of salvaging same, plugging and abandoning of wells,
and removal of all platforms and Facilities, as determined by the Parties.  In the event such withdrawing Party=s interest in such salvage value is
less than such Party=s share of the estimated costs, the
withdrawing Party shall pay the 
Operator, for benefit of the non-withdrawing Parties, a sum  equal to the deficiency.  

. . .

23.1   Applicable Law.  This Agreement shall be interpreted according
to the laws of The State of Texas. 

. . .

26.1   Successors and Assigns.   This Agreement shall be binding upon and
inure to the benefit of the Parties and their respective heirs, successors,
representatives and assigns and shall constitute a covenant running with the
Lease.  Each Party shall incorporate in
any assignment of an interest in the Lease a provision that such assignment is
subject to this Agreement. 








The Operator and the Assignor both assert
that, as to the issues relating to the Operator=s contract claim,
these operating agreements are unambiguous. 
We agree.  After reviewing these
agreements, we conclude that they are unambiguous regarding the issue before us
because they are so worded that they can be given a certain and definite legal
meaning or interpretation.  See
American Manufacturers Mut. Ins. Co., C S.W.3d at C, 2003 WL
22417186, at *2.  Therefore, we construe
these agreements as a matter of law.  See id. 


For the Operator to succeed in its
breach-of-contract claim against the Assignor, the operating agreements  must impose an obligation on the Assignor to
pay the Operator a share of the operator-incurred costs or expenses after the
Assignor=s assignment of
the Working Interests.  In its motion for
partial summary judgment in the trial court and in its appellate brief in this
court, the Operator insists that the Assignor has such an obligation; however, the
Operator does not cite any language from the operating agreements that creates
this alleged obligation.[1]









Section 8.1[2]
states that the Operator will pay all costs initially and then be reimbursed by
each party Ain proportion to its Participating
Interest.@[3]  Section 2.10 defines AParticipating
Interest@ as each party=s respective
percentage of participation Abased on ownership
in the Lease.@ (emphasis added).  After the Assignor assigned the Working
Interests to the Assignee, the Assignor had no ownership in the Lease.  Therefore, under the unambiguous language of
these agreements, the Assignor had no Participating Interest at any time relevant
to this dispute.  Because the
reimbursement obligation in Section 8.1 is based on each party=s Participating
Interest, at no material time did the Assignor have any obligation to repay the
Operator under the unambiguous language of Section 8.1.  Likewise, Sections 14.1 and 14.4 state that
the costs, risks, and net proceeds described in those sections shall be shared
by the parties based on their Participating Interests.  

After reviewing the operating agreements,
we find no provision that imposes any obligation on a former working-interest
owner to pay or reimburse the Operator for costs or expenses incurred after
that owner has assigned all of its working interest to another party.  We must enforce the operating agreements as
written; we cannot rewrite the relevant provisions or add to their language
under the guise of interpretation.  See
American Manufacturers Mut. Ins. Co., C S.W.3d at C, 2003 WL
22417186, at *6; Royal Indem. Co., 388 S.W.2d at 181.  Accordingly, we conclude that although the
Assignor agreed to be bound by the operating agreements in question, the
unambiguous language of these agreements does not require it to reimburse the Operator
for costs or expenses incurred after the Assignor assigned the Working
Interests to the Assignee.  See American
Manufacturers Mut. Ins. Co., C S.W.3d at C, 2003 WL 22417186,
at *6B*7 (holding that
unambiguous language of insurance contract did not impose obligation to
compensate insured for Adiminished market value@).

Although it cites no case directly on
point, the Operator advances the following arguments in support of its position
on this issue: 

(1) The Assignor
remains liable for the costs in question under the operating agreements, even
if the Assignee assumed this liability, because the parties to the operating
agreement never agreed to release the Assignor from its obligations in this
regard. 

(2) Sections 14.1 and 14.4, cited
by the Assignor, do not satisfy the requirements of Texas law for releasing an
assignor from its obligations in this regard. 

(3) Section 15.1 allows parties to
withdraw from the operating agreements, but withdrawing parties still must pay
their share of future well-abandonment and platform-dismantling costs. 








(4) To adopt the
Assignor=s interpretation
would allow a party to keep its working interest while the lease is productive
and then assign the interest for minimal consideration to a financially
insolvent company so as to avoid paying any amounts for plugging, abandonment,
platform removal, and site clearance.  

We do not find these arguments persuasive.  

The first two arguments presume, contrary
to the unambiguous language of the operating agreements, that a former
working-interest owner has such a reimbursement obligation in the first
place.  The operating agreements impose
none.  Had the parties intended to create
such an obligation, they easily could have included language to that effect in
the operating agreements.  They did
not.  The parties are bound by the
agreements they have made, and we will not rewrite them.

As to the third argument, though Section
15.1 allows a party to withdraw, it does not require a party to withdraw rather
than assign its interest.  The operating
agreements allow a party to assign its working interest without any requirement
that the party first give other working-interest owners an opportunity to buy
the interest on the same terms.  See,
e.g., Tenneco, Inc. v. Enterprise Prods. Co., 925 S.W.2d 640, 644 (Tex.
1996)  (involving operating agreement
that gave other owners preferential right to purchase before owner could sell
to entity not a party to the operating agreement).  Certainly, parties to operating agreements,
especially agreements that limit reimbursement obligations to existing
working-interest owners, might wish to bargain for preferential rights to
purchase working interests or to impose restrictions on a party=s ability to
assign interests, for example, only to financially responsible parties or to
parties that can provide additional security for the performance of their
obligations.  The parties made no such
bargain in this case. We will not expand the contractual language to impose obligations
not contained in the agreements.  








The Operator=s fourth argument
fails because, while the wisdom of the contractual provisions the parties
crafted and made part of the operating agreements might be questioned, that is
not a matter for this court, which must enforce the agreements as written.  See American Manufacturers Mut.
Ins. Co., C S.W.3d at C, 2003 WL
22417186, at *6; Royal Indem. Co., 388 S.W.2d at 181.  Because the question before us is not the
wisdom of the agreements, but the clarity and completeness of their terms, once
we find the contracts unambiguous, we must enforce them according to their
terms.

V.  Conclusion

Because the unambiguous language of the
operating agreements does not create the contractual duty that the Assignor
allegedly breached, the Assignor had no breach-of-contract liability to the
Operator as a matter of law.  The trial
court erred in finding it did and in granting summary judgment in favor of the
Operator.  Accordingly, we sustain Eland=s first issue,
reverse the part of the trial court=s judgment that
awards damages against Eland, and render judgment that Seagull take nothing
against Eland.[4]

 

 

 

/s/      Kem Thompson Frost

Justice

 

 

Judgment
rendered and Opinion filed February 19, 2004.

Panel
consists of Justices Fowler and Frost (Brister, Former C. J. not
participating).

 

 

 











[1]  Likewise, the
Operator=s landman, Derold Maney, testified at trial that he
could not point to any place in the operating agreements where it states that
former working-interest owners must reimburse the Operator for a share of costs
incurred after the owner assigned its interest.





[2]  In this opinion,
each time we refer to a ASection,@ we
refer to the language of the two operating agreements in question.





[3]  Emphasis
added.





[4]  The Assignor
raises four other issues on appeal; however, because we have sustained its
first issue, we need not address these issues.