TENNECO INC., Tenneco Oil Company, Enron Natural Gas Liquids Corporation, Enron Liquids Pipeline Company, Enron Liquids Pipeline, L.P., and Enron Corp., Petitioners,

v.

ENTERPRISE PRODUCTS COMPANY, Meridian Oil Hydrocarbons, Inc., Union Pacific Fuels, Inc., and Texaco Exploration and Production, Inc., Respondents.

No. 95–0978.

Supreme Court of Texas.

Argued April 16, 1996.

Decided July 8, 1996.

Rehearing Overruled Aug. 16, 1996.

Jack D. Ballard, Rosemarie Donnelly, Richard P. Keeton, Thomas M. Farrell, Solace H. Kirkland, Houston, for petitioners.

Murray Fogler, Albert R. Lohse, Houston, for respondents.

ABBOTT, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, and GONZALEZ, HECHT, CORNYN, ENOCH, SPECTOR and BAKER, Justices, join.

This case poses a question of first impression concerning the effect of a stock sale on a right of first refusal. The dispute involves ownership rights in a natural gas fractionation plant. Respondents filed this lawsuit, contending that three transactions among several Tenneco and Enron entities violated the fractionation plant's operating agreement. The trial court granted summary judgment for Petitioners. The court of appeals reversed. We reverse the judgment of the court of appeals and render judgment for Petitioners.

I

Enterprise Products Company, Texaco Exploration and Production, Inc., El Paso Hydrocarbons Company, Champlin Petroleum Company and Tenneco Oil Company shared ownership in a natural gas liquids fractionation plant. Meridian Oil Hydrocarbons, Inc. and Union Pacific Fuels, Inc. later succeeded

to the El Paso and Champlin interests. Plant operations were governed by a contract called the Restated Operating Agreement. This agreement provided the plant owners with a preferential right to purchase ownership interest in the plant. Under this preferential right, or "right of first refusal," a plant owner had to make its share available to the other owners before selling to a non-owner. Additionally, the agreement obligated each owner, under certain circumstances, to deliver raw natural gas liquids, or "raw make," to the plant for processing.

Enterprise, Texaco, Meridian and Union Pacific (collectively called "the Enterprise Parties") claim that three transactions, or "transfers," involving Tenneco Oil's ownership share of the plant breached the Restated Operating Agreement. In the First Transfer, Tenneco Oil conveyed its share to Tenneco Natural Gas Liquids Corporation. At the time of the First Transfer, the stock of Tenneco Natural Gas Liquids was wholly owned by Tenneco Oil. In the Second Transfer, Tenneco Oil sold all of Tenneco Natural Gas Liquids' stock to Enron Gas Processing Company, and Tenneco Natural Gas Liquids' name was changed to Enron Natural Gas Liquids Corporation. In the Third Transfer, Enron Gas Processing sold Enron Natural Gas Liquids' stock to Enron Liquids Pipeline Operating Limited Partnership. The Appendix to this opinion summarizes these transactions.

The Enterprise Parties sued Tenneco Oil and its parent corporation, Tenneco Inc. (the Tenneco Defendants), Enron Gas Processing and its parent, Enron Corp., as well as several other Enron affiliates (the Enron Defendants) for injunctive relief and damages for breach of contract, breach of fiduciary duty, and tortious interference with contract. The Enterprise Parties alleged that Tenneco Natural Gas Liquids did not comply with the raw-make delivery obligations that arose under the Restated Operating Agreement as a result of the First Transfer. The Enterprise Parties also claimed that the Second and Third Transfers violated the plant owners' right of first refusal.

## II

In the First Transfer, Tenneco Oil conveyed its interest in the plant to its wholly owned subsidiary, Tenneco Natural Gas Liquids. The Enterprise Parties do not claim that this transfer triggered a right of first refusal because the Restated Operating Agreement allows transfers to wholly owned subsidiaries. Instead, the Enterprise Parties assert that this transaction invoked Section 12.2 of the Restated Operating Agreement. That Section provides:

> No sale, transfer, or assignment of Ownership Interest authorized by Section 12.1 shall be effective hereunder until ... the assignee enters into an agreement with Operator to put through the Facilities a volume of raw make per day at least equal to the volume set forth opposite the name of the Selling Owner on Schedule C hereto.

The "Schedule C" referred to in Section 12.2 was actually preempted by "Exhibit A" under the terms of another contract, the Ratification and Joinder Agreement. The volume attributed to Tenneco Oil by Exhibit A was 31,000 barrels. To comply with Section 12.2, therefore, Tenneco Natural Gas Liquids (the assignee) should have agreed to deliver at least 31,000 barrels per day. At no point, however, did Tenneco Natural Gas Liquids either agree to provide, or actually deliver, the capacity attributed to it. The Enterprise Parties argue that Tenneco Natural Gas Liquids' failure to commit to the 31,000-barrel requirement is a breach of the Restated Operating Agreement.

The trial court granted the Tenneco Defendants' motion for summary judgment regarding the First Transfer without specifying the grounds.[1] The court of appeals reversed, holding that none of the bases upon which the Tenneco Defendants presented their motion supported the summary judgment. —— S.W.2d at ——, 1995 WL 412814. To reverse the court of appeals and reinstate the trial court's judgment, we need to sustain

1. The Enron Defendants did not request summary judgment on this issue because they were not involved in the First Transfer.

only one of the Tenneco Defendants' summary judgment grounds. *Rogers v. Ricane Enterprises*, 772 S.W.2d 76, 79 (Tex.1989).

 One theory upon which the Tenneco Defendants sought summary judgment was the Enterprise Parties' waiver of any complaint about the First Transfer. The affirmative defense of waiver can be asserted against a party who intentionally relinquishes a known right or engages in intentional conduct inconsistent with claiming that right. *Sun Exploration & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex.1987). A waivable right may spring from law or, as in this case, from a contract. *Ford v. Culbertson*, 158 Tex. 124, 308 S.W.2d 855, 865 (1958); *see also Alford, Meroney & Co. v. Rowe*, 619 S.W.2d 210, 213 (Tex.Civ.App.—Amarillo 1981, writ ref'd n.r.e.). A party's express renunciation of a known right can establish waiver. *Rowe*, 619 S.W.2d at 213. Silence or inaction, for so long a period as to show an intention to yield the known right, is also enough to prove waiver. *Id.*

The Tenneco Defendants included in their summary judgment evidence deposition excerpts from the plant owners' designated representatives. Those excerpts demonstrate the following: (1) various owners knew that Tenneco Oil had transferred its ownership interest to Tenneco Natural Gas Liquids; (2) Tenneco Natural Gas Liquids had not executed an agreement in satisfaction of Section 12.2; and (3) Tenneco Natural Gas Liquids was delivering substantially less than 31,000 barrels per day.

Other summary judgment evidence shows that the plant owners accepted Tenneco Natural Gas Liquids as a full-fledged fellow owner and that they had elected not to enforce any rights arising under Section 12.2. The Enterprise Parties executed several amendments and ratifications to the Restated Operating Agreement with Tenneco Natural Gas Liquids, not Tenneco Oil, as a signatory. The Enterprise Parties also afforded all incidents of ownership to Tenneco Natural Gas Liquids, including the right to attend owners' meetings, the right to receive a share of revenues, the obligation to pay a share of costs, and the right to vote on issues requiring owner approval.

The evidence also confirms that over a period of three years, from the date of the First Transfer until the filing of this lawsuit, no owner complained about Tenneco Natural Gas Liquids' failure to comply with Section 12.2. This extended inaction by the plant owners, coupled with their acceptance of Tenneco Natural Gas Liquids as a plant co-owner, establishes an intentional waiver of any rights concerning the First Transfer. *See Rowe*, 619 S.W.2d at 213.

In reversing the trial court's summary judgment, the appellate court stated that parts of the summary judgment proof raised a fact issue about whether the owners had only temporarily accepted Tenneco Natural Gas Liquids' failure to comply with Section 12.2. —— S.W.2d at ——. We disagree.

The court of appeals relied on the testimony of Enterprise Products Company's Charles Roth to support its assertion that the owners' waiver was "temporary." *Id.* at ——. To a question concerning whether Enterprise Products Company had chosen not to enforce Section 12.2 following the First Transfer, Roth replied: "I think it's correct to say that at that time they chose not to do it, yes." The court of appeals held that Roth's reply indicates that the Enterprise Parties did not intend to waive their rights under Section 12.2. —— S.W.2d at ——.

Placed in its proper context, however, Roth's testimony confirms the defense of waiver. Immediately following his "at that time" reply, Roth was asked if Enterprise Products Company ever, until the filing of this lawsuit, sought to enforce Section 12.2. Roth answered that it did not. His testimony does not raise a fact issue concerning the plant owners' acceptance of Tenneco Natural Gas Liquids as an co-owner or their election to forego the enforcement of Section 12.2.

Waiver is ordinarily a question of fact. *See Caldwell v. Callender Lake Property Owners Improvement Ass'n*, 888 S.W.2d 903, 910 (Tex.App.—Texarkana 1994, writ denied); *Rowe*, 619 S.W.2d at 213. Where the facts and circumstances are admitted or clearly established, however, the question becomes one of law. *Id.* In this case, the Tenneco Defendants have shown that until

this lawsuit was filed, the plant's owners accepted Tenneco Natural Gas Liquids as a fellow owner without enforcing Section 12.2. The Tenneco Defendants' proof of waiver, which includes testimonial admissions by the plant owners' designated representatives, establishes the affirmative defense of waiver as a matter of law. Accordingly, we reverse the judgment of the court of appeals regarding the First Transfer.

The Tenneco Defendants also contend that the Enterprise Parties were estopped from complaining about the First Transfer, and that the terms of the Restated Operating Agreement exempted Tenneco Natural Gas Liquids from the delivery obligation. Because we hold that the Enterprise Parties waived their complaint concerning the delivery obligations, we need not address the Tenneco Defendants' other arguments. *See Rogers,* 772 S.W.2d at 79.

### III

■ The Enterprise Parties claim that the Second and Third Transfers invoked the right of first refusal provisions of the Restated Operating Agreement. A right of first refusal, also known as a preemptive or preferential right, empowers its holder with a preferential right to purchase the subject property on the same terms offered by or to a bona fide purchaser. *See Palmer v. Liles,* 677 S.W.2d 661, 665 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). The right of first refusal upon which the Enterprise Parties base their claims arises from Section 12.5 of the Restated Operating Agreement:

> *Preferential Right to Purchase.* Except as provided in Section 12.6 hereof, if any Owner should desire to sell, transfer or assign all or any part of its Ownership Interest, the other Owners shall have the prior and preferential right and option to purchase proportionately the interest to be sold by such Owner upon the same terms and conditions as the bona fide prospective purchaser or purchasers (collectively "Offeror") are offered by such Owner....

Section 12.6 allows transfers to wholly owned subsidiaries such as occurred in the First Transfer. The Second and Third Transfers do not fall within the exception provided in Section 12.6.

### A

The Tenneco and Enron Defendants each filed substantially identical motions for summary judgment contending that the Second Transfer did not invoke the right of first refusal provision. In those motions, the Tenneco and Enron Defendants contend that: (1) the Second Transfer consisted only of a sale of Tenneco Natural Gas Liquids' stock from Tenneco Oil to Enron Gas Processing; (2) a stock sale is merely a transfer of ownership in an entity, not a sale of assets or ownership interest in a plant; (3) Tenneco Natural Gas Liquids' stock, rather than Tenneco Natural Gas Liquids' ownership interest in the plant, was transferred to Enron Gas Processing; and (4) as such, the transfer could not trigger any preferential rights.

As proof that the Second Transfer involved only a stock sale, the Tenneco and Enron Defendants attached to their motions the affidavit of Lou Potempa, an Enron Corp. vice president. Potempa attested that both the Second and Third Transfers were stock purchases in which no assets changed hands. The Defendants did not include in their summary judgment evidence copies of the written agreements for the Second and Third Transfers.

In response, the Enterprise Parties offered three distinct pieces of summary judgment evidence: (1) proof that Tenneco Inc. had offered Tenneco Natural Gas Liquids' assets for sale before it finally settled upon the stock-sale transaction; (2) press releases in which Tenneco Inc. and Enron Corp. announced the completion of the Second Transfer; and (3) testimony from Tenneco Inc. and Tenneco Oil representatives indicating that, for tax purposes, the Tenneco Defendants and Enron Corp. had treated the Second Transfer as an asset sale rather than a stock sale.

### B

■ The court of appeals held that the absence of the Second Transfer's written agreement from the summary judgment evidence raised a fact issue concerning whether

that transfer was a stock sale or an asset sale. —— S.W.2d at ——. We disagree. The Tenneco and Enron Defendants proved that the transfer was a stock sale without including a copy of the relevant agreement in the summary judgment evidence. In the absence of controverting proof, Potempa's affidavit testimony is enough to establish the character of the transaction. *See First Gibraltar Bank, FSB v. Farley*, 895 S.W.2d 425, 428 (Tex.App.—San Antonio 1995, writ denied); *Christian v. University Fed. Sav. Ass'n*, 792 S.W.2d 533, 534 (Tex.App.—Houston [1st Dist.] 1990, no writ). Moreover, there were no objections to the affidavit.

■ Furthermore, the Enterprise Parties' summary judgment evidence does not undermine Potempa's affidavit. First, regardless of whether the parties originally proposed to transfer Tenneco Oil's ownership interest to Enron Gas Processing in an asset sale, the only relevant transaction was the completed stock sale. Preliminary negotiations between offerors and potential purchasers do not trigger preemptive rights. *See Holland v. Fleming*, 728 S.W.2d 820, 822–23 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.); *see also K.C.S., Ltd. v. East Main Street Land Development Corp.*, 40 Md.App. 196, 388 A.2d 181, 183 (1978).

■ Second, the Enterprise Parties improperly rely upon press releases to characterize the Second Transfer. The Tenneco Defendants' press release states that Tenneco Inc. agreed "to sell its natural gas liquids business to Enron Corp. for $632 million." Although the release mentions various "non-core assets," Tenneco Natural Gas Liquids' interest in the fractionation plant is described not as an asset, but as one of the company's "natural gas liquids operations." Enron Corp.'s press release falls even shorter; it clearly describes the transaction solely as an acquisition of Tenneco Natural Gas Liquids' stock. Moreover, even if the releases had portrayed the transfer as an asset sale, press releases do not govern the legal status of a transaction. The press releases simply do not raise a fact issue regarding the nature of the transaction.

■ Finally, the Enterprise Parties incorrectly argue that the election to treat the Second Transfer as an asset sale for tax purposes shows that it may not have been a stock sale. State law, not the Internal Revenue Code, controls the transaction's characterization. How the parties portray their transaction for federal tax purposes is immaterial. *Questa Energy Corp. v. Vantage Point Energy, Inc.*, 887 S.W.2d 217, 221 (Tex.App.—Amarillo 1994, writ denied).

We hold that the summary judgment evidence establishes as a matter of law that the Second Transfer embodied a stock sale and not a transfer of assets. "[T]he purchaser of stock in a corporation does not purchase any portion of the corporation's assets, nor is a sale of all the stock of a corporation a sale of the physical properties of the corporation." *McClory v. Schneider*, 51 S.W.2d 738, 741 (Tex.Civ.App.—Amarillo 1932, writ dism'd); *accord Engel v. Teleprompter Corp.*, 703 F.2d 127, 131 (5th Cir.1983). The transaction was not, therefore, a transfer of Tenneco Natural Gas Liquids' ownership interest in the fractionation plant.

### C

Because the Second Transfer was not a conveyance of Tenneco Natural Gas Liquids' ownership interest in the plant, the Tenneco and Enron Defendants further argue that the transaction did not trigger the Enterprise Parties' preferential right to purchase. Conversely, the Enterprise Parties maintain that no matter how the parties structured the transaction, it was, in substance, a transfer of an ownership interest which invoked the right of first refusal.

The Enterprise Parties argue that we should look to the parties' intent to determine the nature of the transaction. The Enterprise Parties expressly rely upon *Galveston Terminals, Inc. v. Tenneco Oil Co.*, 904 S.W.2d 787 (Tex.App.—Houston [1st Dist.] 1995), *set aside without reference to the merits*, 922 S.W.2d 549 (Tex.1996). In *Galveston Terminals*, Tenneco Oil transferred its interest in a tract of land to a wholly owned subsidiary and then sold all of the subsidiary's stock to a third party. *Id.* 904 S.W.2d at 788–89. The party that origi-

nally conveyed the land to Tenneco Oil claimed that the sale of the subsidiary's stock triggered its preferential right to purchase the land. *Id.* at 789. The court of appeals held that "the character of a legal transaction depends upon the intent and purpose of the parties." *Id.* at 791. To determine the parties' intent, the court explained, Tenneco Oil's transfer of the property to the subsidiary and its subsequent sale of the subsidiary's stock should be viewed as a single transaction. *Id.* Considering the facts in that light, the court held that Tenneco Oil failed to prove as a matter of law that its stock sale did not actually amount to an asset sale. *Id.* at 792.

We expressly disapprove of the court's reasoning in *Galveston Terminals.* Sound corporate jurisprudence requires that courts narrowly construe rights of first refusal and other provisions that effectively restrict the free transfer of stock. *See Consolidated Bearing & Supply Co. v. First Nat'l Bank,* 720 S.W.2d 647, 650 (Tex.App.—Amarillo 1986, no writ); *Gulf States Abrasive Mfg. v. Oertel,* 489 S.W.2d 184, 187 (Tex.Civ.App.—Houston [1st Dist.] 1972, writ ref'd n.r.e.); *see also Frandsen v. Jensen–Sundquist Agency, Inc.,* 802 F.2d 941, 946 (7th Cir.1986) (Posner, J.); *Engel,* 703 F.2d at 134. Viewing several separate transactions as a single transaction to invoke the right of first refusal compromises the law's unfavorable estimation of such restrictive provisions. *See Consolidated Bearing,* 720 S.W.2d at 650; *Gulf States,* 489 S.W.2d at 187.

Moreover, the plain language of the Restated Operating Agreement provides that only a transfer of an ownership interest triggers the preferential right to purchase; it says nothing about a change in stockholders. The Enterprise Parties could have included a change-of-control provision in the agreements that would trigger the preferential right to purchase. None of the agreements among the parties contained such a provision. We have long held that courts will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained. *See Dorroh–Kelly Mercantile Co. v. Orient Ins. Co.,* 104 Tex. 199, 135 S.W. 1165, 1167 (1911); *see also*

*Great Am. Ins. Co. v. Langdeau,* 379 S.W.2d 62, 65 (Tex.1964).

D

In holding that the sale of a corporation's stock does not trigger rights of first refusal, we join courts from other jurisdictions that have considered this issue. *See, e.g., LaRose Mkt. v. Sylvan Ctr.,* 209 Mich.App. 201, 530 N.W.2d 505, 508 (1995); *K.C.S., Ltd. v. East Main Street Land Development Corp.,* 40 Md.App. 196, 388 A.2d 181, 183 (1978); *Cruising World, Inc. v. Westermeyer,* 351 So.2d 371, 373 (Fla.Dist.Ct.App.1977), *cert. denied,* 361 So.2d 836 (Fla.1978); *Torrey Delivery, Inc. v. Chautauqua Truck Sales & Serv.,* 47 A.D.2d 279, 366 N.Y.S.2d 506, 510 (N.Y.App.Div.1975). We also recognize the insight of commentators who have long maintained that stock sales do not invoke preemptive rights. *See, e.g.,* Conine, *Property Provisions of the Operating Agreement—Interpretation, Validity and Enforceability,* 19 Tex. Tech L. Rev. 1263, 1320 & 1320 n. 231 (1988); Reasoner, *Preferential Purchase Rights in Oil and Gas Instruments,* 46 Tex. L. Rev. 57, 72 (1967); Abright, Comment, *Preferential Right Provisions and Their Applicability to Oil and Gas Instruments,* 32 Sw. L.J. 803, 811–12 (1978). A contrary conclusion is an unwarranted impingement on the free transfer of stock.

IV

The Enterprise Parties do not attack the sufficiency of evidence concerning the Third Transfer. Instead, they contend that they were given insufficient opportunity for discovery before the summary judgment was granted on the Third Transfer.

The Enterprise Parties did not complain about the Third Transfer until February 9, 1993, when they filed their second amended petition. The Enron Defendants filed their motion for summary judgment concerning the Third Transfer on April 30, 1993, relying on substantially the same grounds and evidence as they had concerning

the Second Transfer.[2] The order granting the motion for summary judgment was signed only one day after the expiration of the 21–day waiting period prescribed by Rule 166a(c) of the Texas Rules of Civil Procedure.

The Enterprise Parties claimed in their summary judgment response that they knew nothing about the Third Transfer until they deposed Lou Potempa on January 28, 1993. Because the trial court granted summary judgment less than four months later, without affording the Enterprise Parties a chance to discover more facts about the Third Transfer, the court of appeals held that the trial court had improperly disregarded the requirements of Rule 166a(c) and reversed the summary judgment on the Third Transfer. —— S.W.2d at ——. The court of appeals stated that, "given more time, [the Enterprise Parties] might have raised a fact issue concerning the true nature of the Third Transfer." —— S.W.2d at ——.

We hold that the court of appeals erred in reversing the summary judgment. When a party contends that it has not had an adequate opportunity for discovery before a summary judgment hearing, it must file either an affidavit explaining the need for further discovery or a verified motion for continuance. *See* TEX.R. CIV. P. 166a(g), 251, 252; *Gabaldon v. General Motors Corp.*, 876 S.W.2d 367, 369 (Tex.App.—El Paso 1993, no writ); *Watson v. Godwin*, 425 S.W.2d 424, 430 (Tex.Civ.App.—Amarillo 1968, writ ref'd n.r.e.); Hittner & Liberato, *Summary Judgments in Texas*, 35 S. TEX. L. REV. 9, 18 (1994). The Enterprise Parties did neither.

We recently considered a similar issue in *National Union Fire Insurance Co. v. CBI Industries, Inc.*, 907 S.W.2d 517 (Tex.1995) (per curiam). In *National Union*, the court of appeals ruled that the plaintiff had insufficient time to conduct discovery and reversed the trial court's summary judgment. *Id.* 907 S.W.2d at 520. With more time, the court of appeals held, the plaintiff *"might* have raised a fact issue." *Id.* However, because the facts necessary to support the summary judgment were sufficiently developed when the motion was filed, we determined that no further discovery was needed and reversed the appellate court's judgment. *Id.* at 521–22. Similarly, the trial judge in this case had all the relevant information at hand when he granted the Enron Defendants' summary judgment motion. The determination to allow the Enterprise Parties more time for discovery was within the trial court's discretion. *See National Union*, 907 S.W.2d at 520. Because the Enterprise Parties have not shown an abuse of discretion, the court of appeals erred in overturning the summary judgment. We, therefore, reverse the judgment of the court of appeals concerning the Third Transfer.

## V

We hold that the sales of Tenneco Natural Gas Liquids' and Enron Natural Gas Liquids' stock did not invoke any right of first refusal and that the Enterprise Parties waived any complaint concerning Tenneco Natural Gas Liquids' delivery obligations. Accordingly, we reverse the judgment of the court of appeals and render judgment for the Petitioners.

OWEN, J., did not participate in the decision.

---

**2.** The Tenneco Defendants were not a part of the Third Transfer and did not seek summary judg-

ment with regard to that transfer.

APPENDIX

---

## THE FIRST TRANSFER

Tenneco Oil tranfers its ownership interest in the fractionation plant to Tenneco Natural Gas Liquids, its wholly owned subsidiary.

(SHARE OF PLANT)
TENNECO OIL →→→→→→→→→→→→→→→→ TENNECO NATURAL GAS LIQUIDS

---

## THE SECOND TRANSFER

Tenneco Oil sells all of Tenneco Natural Gas Liquids' stock to Enron Gas Processing; Tenneco Natural Gas Liquids' name is changed to to Enron Natural Gas Liquids.

(TENNECO NATURAL GAS LIQUIDS STOCK)
TENNECO OIL →→→→→→→→→→→→→→→→→→→→→→→→ ENRON GAS PROCESSING

---

## THE THIRD TRANSFER

Enron Gas Processing conveys all of Enron Natural Gas Liquids' stock to Enron Liquids Pipeline Operating Limited Partnership.

ENRON (ENRON NATURAL GAS LIQUIDS STOCK) ENRON
GAS →→→→→→→→→→→→→→→→→→→→→→→→→→→→→→→→ LIQUIDS
PROCESSING PIPELINE

1. Before any relevant transactions: Tenneco Oil holds ownership interest in plant and owns all of Tenneco Natural Gas Liquids' stock.

2. Tenneco Oil transfers its ownership interest to Tenneco Natural Gas Liquids (the First Transfer).

3. Tenneco Oil sells Tenneco Natural Gas Liquids' stock to Enron Gas Processing; Tenneco Natural Gas Liquids' name is changed to Enron Natural Gas Liquids (the Second Transfer).

4. Enron Gas Processing conveys Enron Natural Gas Liquids' stock to Enron Liquids Pipeline Operating Limited Partnership (the Third Transfer).

♦ = ownership interest in fractionation plant
TOC = Tenneco Oil Company
EGP = Enron Gas Processing Company

ELP = Enron Liquids Pipeline Operating Limited Partnership
TNGL = Tenneco Natural Gas Liquids Corporation
ENGL = Enron Natural Gas Liquids Corporation