Reversed and Remanded and Majority and Dissenting Opinions filed May 24,
2005









Reversed and Remanded and
Majority and Dissenting Opinions filed May 24, 2005.

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-04-00389-CV

____________

 

PEDRO AGUIAR AND
MARIA AGUIAR,
Appellants

 

V.

 

PAUL SEGAL AND
GEOFFREY ABADEE, Appellees

 



 

On Appeal from the 212th
District Court

Galveston County, Texas

Trial Court Cause No. 03CV1497

 



 

D I S S E N T I N G   O P I N I O N

I do not agree with the majority=s conclusion that
the trial court=s findings of fact are unsupported by the
record.  I must, therefore, respectfully
dissent.








As the trier of fact in a bench trial, the
trial judge determines the credibility of the witnesses and the weight to be
given their testimony, decides whether to believe or disbelieve all or any part
of the testimony, and resolves any inconsistencies in the testimony.  Tagle v. Galvan, 155 S.W.3d 510, 518 (Tex.
App.CSan
Antonio
2004, no pet.).  He may, therefore, draw
reasonable inferences from the evidence, and his findings may not be
disregarded if the record contains some evidence of probative value from which
those inferences may be drawn.  Peter
v. Ogden Ground Servs., Inc., 915 S.W.2d 648, 650 (Tex. App.CHouston [14th Dist.] 1996, no
writ).  Accordingly, we must review the
evidence in the light most favorable to the trial court=s findings.








The earnest money contracts at issue here
were executed on May 12, 2003.  As sellers,
the Aguiars agreed to sell five properties containing approximately 80
apartment units on or before a closing date of July 15, 2003.  Although the buyers, Segal and Abadee, had
access to the $1,140,000.00 needed to make a cash purchase of the five properties,
they chose instead to apply for a loan from Moody National Bank.  In fact, the earnest money contracts contain
customary recitations making them contingent on the availability of third party
financing.[1]  After reviewing the financial status of the
buyers, including tax returns and personal financial statements, the bank
approved a loan of up to 70% of the value of the properties.  On July 9, 2003, the bank issued loan
commitments to the buyers contingent upon the receipt of favorable appraisals
of the properties.  However, on July 15,
2003, the scheduled closing date, the appraisals were not yet complete.[2]  Because the buyers were still waiting on financing,
both parties continued under the assumption that the express terms of the
contract extended the closing date to July 30, 2003.[3]













On July 30, 2003, Pedro Aguiar spoke to
Rebecca Habeb, his realtor, and expressed his concern regarding the delayed
closing because many of his tenants apparently stopped paying rent once they
realized he was a lame duck landlord. 
Habeb explained to Aguiar that verbal appraisals were coming in one by
one on the various properties, but that the bank could not make a full loan
without written appraisals.[4]  Nevertheless, with the receipt of each verbal
appraisal, the bank immediately began finalizing the loan documents for that
particular transaction even in advance of receiving the written appraisal.  Habeb asked Aguiar if he could wait another
week to start the closings.[5]  Aguiar said he could wait another week.[6]  Habeb asked Aguiar if he still wanted to go
forward with the sale.  Aguiar said he
still wanted to go forward with the sale. 
Habeb reminded Aguiar that two appraisal inspections were scheduled for
July 31, 2003, and another inspection was scheduled for August 5, 2003.   Habeb further explained to Aguiar that
because at least four of the written appraisals would each be a hundred pages
in length, the written appraisals could not be completed until a couple of
weeks after the verbal appraisals.[7]  Habeb asked Aguiar if he still wanted to go
forward.  Aguiar said he did.








In preparation for the closing, Aguiar
prepared estoppel certificates for the tenants of four of his properties with a
cover letter announcing to each tenant that A[y]our building is
in the process of being sold.@  Each tenant also received a certificate
certifying the commencement date of his/her individual lease, the date of the
next rent payment, current terms of the lease, the amount of his/her deposit,
the date of expiration of his/her lease, whether he/she had an option to renew,
etc.  Delivery of these certificates to
the tenants began on July 31, 2003.

Although the last apartment appraisal
inspection was conducted on August 5, 2003 (in Aguiar=s presence and
with his assistance), Aguiar terminated the earnest money contracts the
following day on August 6, 2003.[8]  One reason given to Habeb for the termination
was that Galveston properties were selling for more money than the price
stipulated in the earnest money contracts. 
In fact, Segal testified that in September 2003, Aguiar told him the
apartments were worth $5,000 more per unit than they had originally agreed
upon.  Segal said Aguiar offered to go
forward with the sale if he would agree to increase the sale price another
$400,000.  Segal refused.

If, as here, the parties intend that time
is of the essence to a contract, timely performance is essential to a party=s right to require
performance by the other party.  Mustang
Pipeline Co. v. Driver Pipeline Co., 134 S.W.3d 195, 196 (Tex. 2004) (per
curiam).  However, contractual rights can
be waived.  Johnson v. Structured
Asset Servs., LLC, 148 S.W.3d 711, 722 (Tex. App.CDallas 2004, no pet.).  A waiver occurs when a party either
intentionally relinquishes a known right or engages in intentional conduct
inconsistent with claiming that right.  In
re Epic Holdings, Inc., 985 S.W.2d 41, 57 (Tex. 1998).  A party=s silence or
inaction for a period of time long enough to show an intention to yield the
known right, is also enough to prove a waiver.  
Tenneco, Inc. v. Enter. Prods. Co., 925 S.W.2d 640, 643
(Tex. 1996).








Moreover, where a promissee acts to his
detriment in reasonable reliance upon an otherwise unenforceable promise, the
promisor=s promise is
binding if injustice can be avoided only by enforcement of the promise.  Wheeler v. White, 398 S.W.2d 93, 96
(Tex. 1965).  Thus, estoppel arises where
one party has been induced to change his position for the worse because of the
conduct of another party.  Mass.
Bonding & Ins. Co. v. Orkin Exterminating Co., 416 S.W.2d 396, 401
(Tex. 1967).  The doctrine of estoppel
can be invoked where the conduct of one of the parties has been such as to
induce action in reliance upon it, and where it would operate as a fraud upon
the assured if he were afterwards allowed to disavow his conduct.  Johnson, 148 S.W.3d at 721.  Here, Aguiar said he wanted to continue with
the transaction although he was not legally obliged to do so.  Moreover, he indicated by his conduct that he
would permit a reasonable time to obtain the written appraisals.  In reliance, thereon, the record indicates
the buyers expended $11,400 in appraisal fees, $7,525 in loan fees, $1,739 in
survey fees, $2,850 in inspection fees, $257 in tax certificates, and $20,250
for the services of a property manager.

Accordingly, I would defer to the trial
court=s finding that the
Aguiars Aelected by their
silence, conduct and words to treat the contracts as continuing and Plaintiffs
relied on that election to their detriment.@  Because I would affirm the trial court=s judgment, I must
respectfully dissent.

 

 

 

 

/s/      J. Harvey Hudson

Justice

 

 

 

 

Judgment
rendered and Majority and Dissenting Opinions filed May 24, 2005.

Panel
consists of Justices Yates, Anderson, and Hudson.











[1]    The contract
for the property located at 2719 Avenue P., for example, states:

A.         THIRD
PARTY FINANCING:

(1)        The
contract is contingent upon Buyer obtaining a third party loan secured by the
Property in the amount of $120,000 for not less than 20 years with the initial
interest rate not to exceed 62 % per annum.

(2)        Not
later that 7 days after the effective date of the contract.  Buyer must apply for the third party loan
described in Paragraph A(1).  Buyer must
make every reasonable effort to obtain the loan.  Buyer has obtained the loan when the lender
has determined that Buyer has satisfied all of lender=s financial requirements (those items relating to net
worth, income, and creditworthiness).  If
the loan is not obtained within 30 days after the effective date, the contract
will terminate and the earnest money, less any independent consideration under
Paragraph 7B(3)(a) of the contract, will be returned to Buyer.

(3)        Each
note to be executed under this addendum is to be secured by vendor=s and deed of trust liens.

(4)        If the
loan is obtained within the time required under Paragraph A(2) but Buyer=s lender has not completed lender=s closing requirements (for example, survey,
insurance, repairs, closing documents, appraisal), the closing date will be
extended up to 15 days only if necessary to complete lender=s closing requirements.





[2]  In fact, the
loan commitments were not formally accepted and agreed to by the buyers until
July 21, 2003.





[3]  See supra
note 1 (subparagraph A(4)).





[4]  The record
suggests that two verbal appraisals had been obtained by July 30, 2003.





[5]  Rebecca Habeb
testified on redirect examination:

Q          Who
can do it in one more week?

A          No.  If Pedro [Aguiar] can hold out for one more
week to start the closings.

Q          To
start the closings?

A          Right.

Q          But
not to close entirely?

A          No.  To start the closings.

Q          As a
matter of fact that=s what your memo says, isn=t it?

A          Right.

Q          It says eight lines
down, could he hold out for one more week. 
Do you see that?

A          Yes.

Q          Parentheses, which is
when the bank says they can start closing. 
You even put the word start closing in there, didn=t you?

A          Correct.

Q          So you did not
represent to Pedro [Aguiar] that this deal could be closed in one week, did
you?

A          No.

Further, Segal testified that he was prepared to
conduct individual closings on each of the five properties as the documents
were completed, but Aguiar insisted on waiting until all five properties could
be closed simultaneously. 





[6]  Rebecca Habeb
testified on redirect examination:

Q          Did you ever tell
[Aguiar] that all five properties would close within one week?

A          No.

Q          And he knew they could
not close within one week because three properties had not yet been appraised?

MR. FIEGLEIN:  Objection,
leading.  Calls for speculation.

THE COURT:  Sustained.

Q          Did he know that three
of the properties could not close because they had not yet been appraised?

MR. FIEGLEIN:  Objection, Your
Honor.  Calls for speculation.  No predicate.

THE COURT:  Rephrase it.

Q          You heard Mr. Fieglein
ask you on cross examination if Mr. Aguiar was aware of the fact that the
property had to be appraised, do you remember that?

A          Yes.

Q          And
you answered that he was aware of it?

A          Yes.

Q          And was he also aware
of the fact before the bank would lend the money the property had to be
appraised?

A          Yes.

Q          If he was aware of that
and three parcels of property had not yet been appraised was he therefore aware
of the fact that the bank was not ready to lend the money on those three
parcels until they had been appraised?

MR. FIEGLEIN:  Objection.  Calls for speculation.

THE COURT:  Overruled.

A          He was
aware, yes.

Q          And then it says that I
asked him directly if he wanted to extend and he said yes.  You asked him if he wanted to extend what?

A          The
time to closing.

Q.         On the
five parcels of property?

A          Right.  The properties, he wouldn=t sell one.  It
was all five or that was the agreement when the price was set for all five
properties.

Q          If he wanted to
continue with the sale of the property he knew that the three appraisals would
have to be accomplished first, did he not?

A          Yes.

Q          And it would therefore
take more than one week, is that correct?

A          Yes.

Q          Now, did you ever tell
him how long it would take to close the sale on these properties after the
appraisal?

A          No.  I was guessing two to three weeks.  I had no idea.  The bank wasn=t
talking to me.  They were talking to Paul
Segal.

 





[7]  One written
appraisal was completed on July 23, 2003; three were completed on August 15,
2003; and another was completed on August 27, 2003.





[8]  The bank was
ready for closing on all five properties on August 24, 2003.