

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00027-CV

_____

NORTEX MINERALS, L.P. AND PETRUS INVESTMENT, L.P., Appellants

V.

BLACKBEARD OPERATING, LLC; BLUESTONE NATURAL RESOURCES II, LLC; AND DIVERSIFIED PRODUCTION, LLC, Appellees

---

On Appeal from the 348th District Court
Tarrant County, Texas
Trial Court No. 348-325747-21

---

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

Appellants Nortex Minerals, L.P. and Petrus Investment, L.P. appeal from a summary-judgment order in which the trial court did not accept their interpretation of an assignment provision in an oil-and-gas lease. In their sole issue, Appellants seek to have this court accept their interpretation and hold that the provision at issue required Appellees Blackbeard Operating, LLC and BlueStone Natural Resources II, LLC to obtain Nortex's consent before "transferring ownership" to Appellee Diversified Production, LLC. Because the sale of equity in BlueStone did not constitute a transfer of an interest in the leases at issue, and thus did not trigger the leases' consent provision, we decline to accept Appellants' interpretation of the assignment provision and affirm the trial court's judgment.

## II. Background

The affidavit of Blackbeard's general counsel sets forth the background related to how Blackbeard came to own an interest in the Alliance Leases[1] that are at issue, and even though that background is complex, the question before us involves a single, short paragraph in the Alliance Leases. The affidavit explains that

> [t]he Alliance Master Lease is the first in a series of identical (or nearly identical) leases between Nortex Minerals, LP or Petrus Investment, LP, as lessor, and Chief Holdings LLC or Quicksilver Resources, Inc.

---

[1]AllianceTexas is a 27,000-acre real-estate development consisting of commercial properties, as well as an airport and railroad facilities. The minerals under AllianceTexas are managed by Nortex.

2

([]QRI[]), as lessee. In May 2003, Nortex entered the Alliance Master Lease with Chief. From 2003 through 2008, Nortex and Chief entered into a series of identical leases covering additional acreage in Tarrant and Denton Counties. In 2008, Chief assigned its entire interest in those leases to QRI. From 2009 through 2014, Nortex and Petrus entered into additional, nearly identical leases with QRI. Those leases, twenty-three in total, are collectively the "Alliance Leases."

. . . .

6. Some of the Alliance Leases have been amended since their effective date. The only amendment that affects the Limited Assignment Provision included in paragraph 10 is the Alliance Leases Amendment. That May 20, 2008 amendment created the current version of the Limited Assignment Provision . . . . [Exhibit references omitted.]

The text of the amended Limited Assignment Provision that we must construe

is as follows:

Except as provided herein, Lessee may not assign or otherwise transfer an interest in this Lease without prior written consent of Lessor, which consent may be granted or denied in the sole and absolute discretion[,] and without such consent, any instrument purporting to assign or otherwise transfer of this lease shall be void. Lessee shall have the right to transfer this Lease in its entirety without obtaining consent from lessor if such transfer of the Lease is (i) part of a merger, sale of membership interests or combination of Lessee and another entity[,] or a sale of all or substantially all of Lessee's assets or (ii) as part of a transaction in which the transferee is a publicly traded energy company with a market capitalization in excess of $1 billion.[] Items (i) and (ii) are referred to herein as "Permitted Transfers[."]

Blackbeard's general counsel's affidavit continued to describe the history of the

title to the leases and the background of the transaction that created the question

regarding whether the Limited Assignment Provision triggered a need for Nortex to

consent to the transaction:

3

The Alliance Leases entered into after May 20, 2008[,] contain the amended language for the Limited Assignment Provision. No other amendments affect the Limited Assignment Provision or the notice-and-cure requirements of paragraph 23.

7. Through its bankruptcy proceedings in March 2015, QRI transferred 54.375% of its interest in the Alliance Leases to BlueStone. . . .

8. In 2018, Blackbeard acquired BlueStone's equity. At that point, BlueStone became Blackbeard's wholly owned subsidiary. At no point since acquiring QRI's interest in the Alliance Leases did BlueStone transfer its interest in the Alliance Leases to any other entity, including after BlueStone's acquisition by Blackbeard.

9. At the beginning of 2021, Blackbeard entertained bids from prospective purchasers interested in acquiring BlueStone's interest in the Alliance Leases—being all or substantially all of BlueStone's assets. Nortex submitted a bid to purchase those interests, but [its] bid was ultimately less than half of the winning bid belonging to [Diversified Production, LLC (DGO)]. During Blackbeard and DGO's negotiations, the parties ultimately agreed to transition the deal from a sale of all of BlueStone's assets to a sale of all of BlueStone's equity.

10. In May 2021, Blackbeard entered into a Purchase and Sale Agreement [(PSA)] with DGO . . . . DGO is an affiliate of Diversified Energy Company PLC (a publicly traded energy company with a market capitalization in excess of $1 billion). The PSA provides for DGO's acquisition of all membership interests in BlueStone's equity. To accomplish the sale, the PSA provides for converting BlueStone into a Texas LLC, merging BlueStone into various other Texas LLCs, and [having] BlueStone surviv[e] the merger for DGO to purchase all of BlueStone's equity.[2]

. . . .

12. On May 21, 2021, [Blackbeard's general counsel] sent Nortex and Petrus a letter notifying them of Blackbeard's plans to sell

---

[2]A flowchart of the transaction, which was included in Blackbeard and BlueStone's brief, is attached as Appendix A to this opinion.

BlueStone's equity to DGO. . . . In that letter, [Blackbeard's general counsel] provided detailed information about DGO, the conversions and mergers provided for by the PSA, and the value Blackbeard and DGO allocated to BlueStone's ownership of the Alliance Leases. [Blackbeard's general counsel] also provided them with a redacted copy of the PSA. In that letter, Blackbeard offered to sell BlueStone's interest in the Alliance Leases to [Nortex and Petrus] on the same terms and for the same price as offered to . . . DGO in the PSA. At no point since sending that letter has Nortex or Petrus accepted that offer.

13. On June 3, [2021, Nortex and Petrus] responded to [Blackbeard's general counsel's] letter, withholding their consent to the DGO sale but not affirmatively electing to exercise their option to purchase. . . . That letter made vague reference to alleged surface obligations BlueStone and Blackbeard owed [Nortex and Petrus] but did not notify [Blackbeard and BlueStone] that they [had] breached the Alliance Leases. On June 8, [2021,] [Nortex and Petrus] sued [Blackbeard and BlueStone] for breaches of the Alliance Leases.

The pleadings reflect that Appellants also sought a declaration that the Limited Assignment Provision required Nortex's consent for the outlined equity sale to occur. Blackbeard and BlueStone answered and counterclaimed seeking declarations of their own.

Three months after Appellants filed suit, Blackbeard and BlueStone filed a traditional motion for summary judgment that attached the affidavit just quoted. Appellants filed a motion for partial summary judgment, as well as a second amended petition that added Diversified. In response to the motions for summary judgment, Appellants and Blackbeard and BlueStone filed responses and replies. The trial court summarized these competing motions for summary judgment in the "Order

Regarding Defendants' Traditional Motion for Summary Judgment and Plaintiffs'

Motion for Partial Summary Judgment":

> In their Motion for Summary Judgment, Defendants Blackbeard Operating, LLC (Blackbeard) and BlueStone Natural Resources II, LLC (BlueStone) argue that[] (1) the Limited Assignment Provision, as defined in the Defendants' motion, does not apply to the Purchase and Sale Agreement (PSA) between Blackbeard and Diversified Production, LLC (DGO) for the sale of BlueStone's equity[,] (2) even if the Limited Assignment Provision did apply, the sale of BlueStone's equity is a Permitted Transfer and Plaintiffs failed to timely accept the purchase offer[,] (3) the consent requirement is unenforceable as an unreasonable restraint on alienation[,] and (4) Plaintiffs' breach[-]of[-]contract claims against Defendants fail because Plaintiffs failed to provide pre-suit notice and the opportunity to cure.

> In their Motion for Partial Summary Judgment, Plaintiffs Nortex Minerals, LP (Nortex) and Petrus Investment, LP argue that[] (1) the sale of BlueStone's equity constitutes a transfer of the Alliance Leases subject to Nortex's right to withhold consent[,] (2) Nortex timely withheld consent to the transfer of Blackbeard's and BlueStone's partial interest in the Alliance Leases to DGO[,] and (3) the PSA is void to the extent it purports to transfer Blackbeard's membership interest in BlueStone or Blackbeard's and BlueStone's interest in the Alliance Leases to DGO. [Footnote omitted explaining that Defendants refers to Blackbeard and BlueStone only.]

The trial court then went on to explain why the DGO equity transaction did

not trigger the consent requirement of the Limited Assignment Provision:

> Pursuant to *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 645–46 (Tex. 1996)[,] and Tex. Bus. Orgs. Code [Ann.] §§ 10.008(a)(2)(C), 10.106(a)(2)(C), the [c]ourt determines that the sale of BlueStone's equity is not a transfer of Defendants' interest in the Alliance Leases, so the DGO sale does not trigger Nortex's consent rights. Although Plaintiffs argue that the "Alliance Leases contemplate mergers and sales of membership interests as transfers of an interest in the leases," the [c]ourt agrees with the Defendants that this argument improperly reads a change-of-control provision into the Alliance Leases. Because the

6

> Limited Assignment Provision does not apply to the DGO sale, the [c]ourt need not determine whether the sale is a Permitted Transfer, Plaintiffs failed to timely accept the purchase offer, or the Limited Assignment Provision is an unreasonable restraint on alienation. The [c]ourt, accordingly, grants the Defendants' Motion for Summary Judgment on this issue.

The trial court also found that notice and an opportunity to cure is not a condition precedent to Plaintiffs'/Appellants' breach-of-contract suit and that Defendants'/Appellees' Motion for Summary Judgment on Plaintiffs' breach-of-contract claims should be denied. Accordingly, the trial court granted Defendants'/Appellees' summary-judgment motion on their claim that the DGO sale was not a transfer of their interest in the Alliance Leases subject to Nortex's consent rights under the Limited Assignment Provision, denied the remainder of Defendants'/Appellees' motion, and denied Plaintiffs'/Appellants' motion for partial summary judgment. The trial court heard the competing summary-judgment motions on December 9, 2021, but did not sign an order until November 8, 2022.

During the eleven months between when the trial court heard the competing summary-judgment motions and signed the order disposing of them, Diversified answered, counterclaimed for a declaration regarding the equity sale, and filed a motion for summary judgment and an amended motion. Appellants responded. Appellants also filed a notice of partial nonsuit as to their breach-of-contract claim against BlueStone and their tortious-interference claims against Blackbeard and Diversified. The trial court considered Diversified's amended motion for summary

7

judgment and the response and granted the motion "for the reasons, and to the same extent, as set forth in the [c]ourt's Order Regarding Defendants' Traditional Motion for Summary Judgment and Plaintiff[s'] Motion for Partial Summary Judgment dated November 8, 2022."

In addition to the January 11, 2023 order granting Diversified's amended motion for summary judgment, the trial court signed a separate "Final Judgment," referencing its prior interlocutory decisions of November 8, 2022, and January 11, 2023. The trial court's final judgment, which stated that it "resolve[d] all claims and causes of action asserted against all parties in this matter," reiterated that "[i]n accordance with those rulings, the [c]ourt hereby declares that the sale of equity in BlueStone . . . was not a transfer of an interest in the Alliance Leases, so the sale did not trigger Nortex's consent rights in those leases."

Appellants then perfected this appeal.

### III. The Interlocutory Orders Merged into the Final Judgment

At the outset, we address Diversified's argument that Appellants waived their appeal as to Diversified by failing to specifically challenge the separate order that granted Diversified's amended motion for summary judgment. Diversified contends that Appellants explicitly limited their requested relief to reversal of the order granting Blackbeard's and BlueStone's motion and the final judgment. Appellants respond that they properly appealed and assigned error to the final judgment containing the declaratory judgment in question. We agree with Appellants.

8

"When a trial court renders a final judgment, the court's interlocutory orders merge into the judgment and may be challenged by appealing that judgment." *Bonsmara Nat. Beef Co. v. Hart of Tex. Cattle Feeders, LLC*, 603 S.W.3d 385, 390 (Tex. 2020). Moreover, a notice of appeal from a final judgment need not identify every adverse interlocutory ruling merged into the final judgment that an appellant intends to challenge. *See MacDonald v. Harris Methodist HEB Hosp.*, No. 02-10-00267-CV, 2011 WL 2651991, at *2 (Tex. App.—Fort Worth July 7, 2011, no pet.) (mem. op.).

Here, Appellants properly challenged the final judgment, which incorporated the order granting Diversified's amended motion for summary judgment. Accordingly, we hold that Appellants did not waive their appeal as to Diversified.

## IV. No Transfer Occurred to Trigger Consent

In Appellants' sole issue, they argue that a sale of membership interests in a lessee constitutes a transfer of an interest in a lease, thus triggering Nortex's consent right. However, Appellants' interpretation is not supported by the plain language of the unambiguous Limited Assignment Provision.

### A. Standard of Review

Declaratory judgments decided by summary judgment are reviewed under the same standards of review that govern summary judgments generally. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.010. We review a summary judgment de novo. *Travelers Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable

9

to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both parties' summary-judgment evidence and determine all questions presented. *Mann Frankfort*, 289 S.W.3d at 848. We should then render the judgment that the trial court should have rendered. *See Myrad Props., Inc. v. LaSalle Bank Nat'l Ass'n*, 300 S.W.3d 746, 753 (Tex. 2009); *Mann Frankfort*, 289 S.W.3d at 848.

## B.    Applicable Law

In construing a contract, our primary concern is to determine the parties' intent as expressed by the contract's plain language. *Wagner v. Apache Corp.*, 627 S.W.3d 277, 285 (Tex. 2021). A court must examine and consider the entire writing to harmonize and give effect to all provisions, but no one asserts here that the Limited Assignment Provision conflicts with any other portions of the Alliance Leases or that the provision cannot be given a definite legal meaning. *See id.* ("A contract is unambiguous if it can be given a definite or certain legal meaning."). An unambiguous document will be enforced as written. *In re Davenport*, 522 S.W.3d 452, 457 (Tex. 2017) (orig. proceeding).

## C.    Analysis

The question before us is whether Blackbeard's sale of equity in BlueStone constituted a transfer by a lessee of an interest in the Alliance Leases such that Nortex's consent was required pursuant to the Limited Assignment Provision. The framework that we use to answer this question will follow the same decisional path that the trial court outlined in its "Order Regarding Defendants' Traditional Motion for Summary Judgment and Plaintiffs' Motion for Partial Summary Judgment": (1) we will determine if a transfer occurred; (2) if a transfer occurred, we will determine whether it was a permitted transfer; and (3) if it was not a permitted transfer and consent was required, we will determine whether the provision is an unenforceable restraint on alienation. As explained below, our analysis ceases after the first step in the framework because we conclude that Blackbeard's equity sale did not constitute a transfer by a lessee.

As set forth above, the plain language of the Limited Assignment Provision states, "Except as provided herein, Lessee may not assign or otherwise transfer an interest in this Lease without prior written consent of Lessor." Here, Blackbeard's general counsel's affidavit described how Blackbeard's sale of BlueStone's equity occurred through a series of mergers, with BlueStone retaining its interest in the Alliance Leases after the mergers were complete (as noted on the flowchart in Appendix A). Blackbeard and BlueStone argue that the mergers did not transfer an interest in the Alliance Leases and support their argument by referencing Business

11

Organizations Code Section 10.008(a)(2)(C). *See* Tex. Bus. Orgs. Code Ann. § 10.008(a)(2)(C). That subsection demonstrates that the effect of a merger is not a transfer:

> When a merger takes effect[,] . . . all rights, title, and interests to all real estate and other property owned by each organization that is a party to the merger is allocated to and vested, subject to any existing liens or other encumbrances on the property, in one or more of the surviving or new organizations as provided in the plan of merger *without . . . any transfer or assignment having occurred.*

*Id.* (emphasis added).

Blackbeard and BlueStone also point to Texas Supreme Court precedent narrowly construing restrictions on transfers of property. *See Tenneco*, 925 S.W.2d at 646. In *Tenneco*, the co-owners of a natural gas plant entered into an operating agreement that provided the plant owners with a preferential right to purchase any other owner's interest in the plant. *Id.* at 641–42. Tenneco sold all of one of the co-owner's stock to a third party. *Id.* at 642. The other owners in the plant sued Tenneco, claiming that the stock sale violated the right of first refusal. *Id.* The supreme court held that "the summary[-]judgment evidence establishe[d] as a matter of law that the Second Transfer embodied a stock sale and not a transfer of assets" and that "[t]he transaction was not, therefore, a transfer of . . . ownership interest in the fractionation plant." *Id.* at 645. The supreme court went on to explain that

> the plain language of the Restated Operating Agreement provides that only a transfer of an ownership interest [in the plant] triggers the preferential right to purchase; it says nothing about a change in stockholders. The Enterprise Parties could have included a change-of-

12

control provision in the agreements that would trigger the preferential right to purchase. None of the agreements among the parties contained such a provision. We have long held that courts will not rewrite agreements to insert provisions [that] parties could have included or to imply restraints for which they have not bargained.

*Id.* at 646. As in *Tenneco*, the Alliance Leases contained no change-of-control provision, and we will not add one. The plain language of the Limited Assignment Provision unambiguously required a "transfer [of] an interest in th[e] Lease" to trigger the consent provision, but no such transfer occurred during the equity sale. Having determined that there was no transfer, we need not proceed down the framework.

Appellants, however, focus on the carve out for Permitted Transfers, attempting to show that this scenario was not a Permitted Transfer and that consent was therefore required. As noted in the framework that we set forth at the outset of the analysis section, we do not engage in a determination of whether this scenario falls into the carve out for a Permitted Transfer because there was no transfer. To the extent that Appellants' argument can be read to say that the Permitted Transfer portion of the Limited Assignment Provision expands the first sentence of the Limited Assignment Provision—the sentence providing the general consent rule that "[e]xcept as provided herein, Lessee may not assign or otherwise transfer an interest in this Lease without prior written consent of Lessor"—because the Permitted Transfer carve out exempts some mergers (i.e., that a merger requires Nortex's consent), as noted in Blackbeard and BlueStone's brief,

The Permitted Transfer rule *does not* generally exempt mergers and membership sales; it exempts only[] "*transfer[s] of the Lease* [that are] (i) *part of* a merger, sale of membership interests or combination of Lessee and another entity or a sale of all or substantially all of Lessee's assets or (ii) as *part of* a transaction in which the transferee is a publicly traded energy company with a market capitalization in excess of $1 billion."

For there to be a Permitted Transfer under the Alliance Leases, there has to be a "transfer of the Lease," and that transfer has to be "part of" certain changes of control or "part of" a sale to a specific kind of company. [Appellants'] argument leaves out these two predicate requirements. [Record reference omitted.]

Ultimately, Appellants' argument emphasizing the "merger" portion of the Limited Assignment Provision and their argument in their reply brief as to the definition of "part of"—that the carve out "applies if the transfer is an integral element of a merger"—fails because there must be a transfer of the lease. Appellants' premise regarding why the exception covers Blackbeard's sale of equity in BlueStone turns on the broad reading of "interest," i.e., since the sale of equity must be the transfer of an interest, the language of the exception embraces the equity sale because it is "part of" the transfer of an interest. In their reply brief, Appellants take aim at Appellees' referring to the term "interest" in the Limited Assignment Provision as a "property interest." Appellants contend that by "adding the word 'property,' [Appellees] shift attention from the plain meaning of the word 'interest,' which means more than a direct property interest"; Appellants then set forth a variety of definitions of the word "interest." Yet, directly preceding that contention and the definitions set forth by Appellants, Appellants state, "But the leases do not refer to a 'property

14

interest'; they refer to 'an interest in this Lease.'" This latter portion is what Appellants home in on, arguing that

> [t]he ordinary meaning of "interest" *also* includes participating in an "advantage" or "profit." When it became the 100% owner of BlueStone, Diversified undeniably received the right to participate in the "advantage" or "profit" of the Alliance Leases. Thus, it acquired an "interest" in the leases.

Appellants' argument is divorced from the word that precedes "an interest in this Lease" and is at the crux of this appeal—"transfer." BlueStone did not "transfer an interest in this Lease." Whether some profits from the Alliance Leases may flow to Diversified due to the structure of the equity sale is not before us. We were tasked only with determining whether the equity sale "transfer[red] an interest in this Lease," and we conclude that no transfer occurred because BlueStone continues to own its same interest in the Alliance Leases. We are thus not persuaded to alter our analysis based on Appellants' definition-of-interest argument. In the absence of a transfer, the Permitted Transfer carve out does not support Appellants' interpretation of the Limited Assignment Provision.

Additionally, we decline to look at the history and context of the Limited Assignment Provision (including prior versions of the provision), as Appellants would have us do, because the plain language of the Limited Assignment Provision is unambiguous and because the amended version superseded and replaced the prior version. *Cf. Webb v. Martinez*, No. 04-16-00042-CV, 2016 WL 7234044, at *2 (Tex. App.—San Antonio Dec. 14, 2016, no pet.) (mem. op.) ("Because the reservation

15

clause is unambiguous, we may not look outside the four corners of the deed to vary the terms of the reservation clause."). Furthermore, we disagree with Appellants' contention that "neither the general rule in *Tenneco* nor the statutes [such as Business Organizations Code Section 10.008(a)(2)(C)] override the fact that these parties agreed that consent would be required for certain sales of equity—namely, 'sale[s] of membership interests'"; their contention relies on language from the Permitted Transfer section that we do not reach, and as explained above, both *Tenneco* and Section 10.008(a)(2)(C) support the conclusion that no transfer occurred as a result of the equity sale. And although Appellants contend that the trial court "failed to grapple" with the "bedrock rule" from *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 488 (Tex. 2019), that "parties are free to contract around established industry custom and usage," the parties here did not contract around the general rule, so *Barrow-Shaver* does not apply.

Based on our de novo review, we conclude as the trial court did that the sale of equity in BlueStone was not a transfer of interest in the Alliance Leases, so the sale did not trigger Appellants' consent rights in those leases.[3] We therefore overrule Appellants' sole issue.

---

[3]Alternatively, the Limited Assignment Provision was not triggered because it required that the lessee transfer an interest in the leases, and Blackbeard was not a lessee. Thus, this provides an alternative ground to affirm the trial court's declaration that Blackbeard's equity sale to Diversified did not trigger the consent provision.

## V. Conclusion

Having overruled Appellants' sole issue, we affirm the trial court's final judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: November 9, 2023

# The Equity Sale

