

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-09-00205-CV

JACQUELINE RUTLEDGE
HENDERSON

APPELLANT

V.

DANIEL HENDERSON

APPELLEE

-----------

## FROM COUNTY COURT AT LAW NO. 1 OF PARKER COUNTY

-----------

## MEMORANDUM OPINION[1]

----------

In this appeal from the trial court's clarification and enforcement of a divorce decree, Appellant Jacqueline Rutledge Henderson contends in her sole issue that the trial court abused its discretion by ordering her to sign voting agreements which changed the substantive property division of the parties' agreement incident to divorce (AID). Because we hold that the trial court abused

---

[1]*See* Tex. R. App. P. 47.4.

its discretion by ordering that Jacqueline sign the voting agreements to the extent that they modified the AID regarding Daniel's right of first refusal but also hold that the trial court did not otherwise abuse its discretion, we affirm the trial court's orders as modified.

## I. Background Facts and Procedural History

Daniel and Jacqueline entered into an AID in which they divided their marital estate. Under the AID, Jacqueline received, among other assets, one-half of the couple's "ownership" in nine apparently closely held companies. The AID provides in relevant part,

> To the extent permitted by law, the parties stipulate that this agreement is enforceable as a contract. In consideration of the mutual undertakings and obligations contained in this agreement, the parties agree as follows:
>
> . . . .
>
> 1.2  *Agreement Relating to Stock Restrictions Related to the Stock Awarded to Jacqueline . . . .*
>
> It is agreed between the parties that although Jacqueline . . . is hereby awarded shares of stock or units in the entities . . . , [she] hereby agrees that she will not have the right to vote pursuant to her ownership of such stock or units. Jacqueline . . . hereby agrees that she will execute all documents necessary to permit Daniel . . . to exercise voting rights relating to the shares of stock or units awarded to her herein, including, but not limited to, limited powers of attorney or the placement of the shares of stock into a voting trust as determined by Daniel . . . .
>
> It is further agreed between the parties that although Jacqueline . . . is hereby awarded shares of stock or units in the entities . . . , [she] hereby agrees that Daniel . . . is hereby awarded a right of first refusal to purchase the stock or units awarded herein to [her]. Jacqueline . . . hereby agrees that she will execute all

2

documents necessary to confirm the right of first refusal as provided herein.

It is further agreed between the parties that although Jacqueline . . . is hereby awarded shares of stock or units in the entities . . . , [she] hereby agrees that such shares of stock or units can only be sold to other current shareholders of the companies issuing the stock or units (the shares of stock or units sought to be sold in a particular company may only be sold to a shareholder in that particular company).

Jacqueline . . . hereby acknowledges it is the intent of the parties pursuant to the preceding provisions that she will have no involvement or participation in the management of any of the companies in which she is awarded stock or units, including employment, consulting, or otherwise.

. . . .

. . . .

*4.8    Successors and Assigns*

This agreement, except as it otherwise expressly provides, will bind and inure to the benefit of the respective legatees, devisees, heirs, executors, administrators, assigns, and successors in interest of the parties.

. . . .

4.14  *Agreement Voluntary and Clearly Understood*

Each party to this agreement-

(a)    is completely informed of the facts relating to the subject matter of this agreement and of the rights and liabilities of both parties;

(b)    enters into this agreement voluntarily after receiving the advice of independent counsel;

(c)    has given careful and mature thought to the making of this agreement;

(d)     has carefully read each and every provision of this agreement;

(e)     completely understands the provisions of this agreement, concerning both the subject matter and legal effect;

(f)     stipulates this agreement to be a just and right division of marital debts and assets; and

(g)     states that this agreement was signed without any coercion, any duress, or any agreement other than those specifically set forth in this agreement.

The AID was incorporated into the parties' March 30, 2005 divorce decree.  No appeal was taken from that decree.

In July 2005, Daniel sent to Jacqueline proposed voting agreements for her shares of stock and units.  The voting agreements for the shares of stock provide,

**AGREEMENT:**

NOW, THEREFORE, in consideration of the foregoing and the mutual promises contained herein, the Parties agree as follows:

1.     Voting Agreement.  JRH [Jacqueline] agrees to vote any shares of common stock of the Corporation beneficially owned by her (the "**Capital Stock**") in the manner and as directed by DAH [Daniel].

2.     Irrevocable Proxy.  In connection with the voting agreement in Section 1 above, JRH revokes any previously executed proxies and appoints DAH as her proxy to attend shareholders' meetings, vote, execute consents, and otherwise act for JRH in the same manner as if she were personally present.  **This proxy is irrevocable and is coupled with an interest.**

3.     Term.  This Agreement shall be effective as of the date hereof and shall continue in effect for a period of fifteen (15) years from the date hereof.

. . . .

5.     Restrictions on Transfer; Right of First Refusal.

5.1     Restrictions on Transfer.  JRH shall not assign sell, offer to sell, pledge, mortgage, hypothecate, encumber, liquidate, dispose of or otherwise transfer (a **"Transfer"**) any of the Capital Stock of the Corporation other than in accordance with this Agreement.  Any purported Transfer of Capital Stock by JRH or her successors or assigns (or any successor transferee or assignee) shall be ineffective until the transferee has agreed to become bound as an assignee of the rights and obligations of JRH (or such successor transferee or assignee) under this Agreement, including without limitation the voting agreement, irrevocable proxy and Right of First Refusal set forth herein.

5.2     Transfer only to Current Shareholders.  Pursuant to the Property Agreement, JRH agrees that the shares of the Corporation received by JRH under the Property Agreement can only be sold to other current shareholders of the Corporation.

5.3     Definitions.  As used herein, the following terms shall be defined as follows:

**"Proposed Transfer"** means any proposed Transfer of any Capital Stock (or any interest therein) proposed by JRH.

**"Proposed Transfer Notice"** means written notice from JRH to DAH setting for the terms and conditions of a Proposed Transfer.

**"Prospective Transferee"** means any person to whom JRH proposes to make a Proposed Transfer.

**"Right of First Refusal"** means the right, but not an obligation, of DAH to purchase some or all of the Transfer Stock with respect to a Proposed Transfer, on the terms and conditions specified in the Proposed Transfer Notice.

5

**"ROFR Notice"** means written notice from DAH notifying JRH that he intends to exercise his Right of First Refusal as to some or all of the Transfer Stock with respect to any Proposed Transfer.

**"Transfer Stock"** means shares of Capital Stock subject to a Proposed Transfer.

5.4     Grant.     JRH hereby unconditionally and irrevocably grants to DAH a Right of First Refusal to purchase all or any portion of the Capital Stock that JRH may propose to Transfer, at the same price and on the same terms and conditions as those offered to the Prospective Transferee.

5.5     Notice.  JRH must deliver DAH a notice regarding any proposed Transfer not later than 30 days prior to the consummation of such proposed Transfer.  Such Proposed Transfer Notice shall contain the material terms and conditions (including without limitation the purchase price therefore) of the Proposed Transfer and the identity of the Prospective Transferee.  DAH must exercise his Right of First Refusal under this Section 5 by giving a ROFR Notice to [J]RH within fifteen (15) days after delivery of the Proposed Transfer Notice.

5.6     Consideration; Closing.     If the consideration proposed to be paid for the Transfer Stock is in property, services or other non-cash consideration, the fair market value of the consideration shall be determined in good faith by DAH.  If DAH cannot for any reason pay for the Transfer Stock in the same form of non-cash consideration, DAH may pay the cash value equivalent thereof.  The closing of the purchase of Transfer Stock by DAH shall take place, and all payments from DAH shall have been delivered to [J]RH, by the later of (i) the date specified in the Proposed Transfer Notice as the intended date of the Proposed Transfer and (ii) forty-five (45) days after delivery of the Proposed Transfer Notice.

5.7     Sale by JRH; Restart of Right of First Refusal.  If any shares of Transfer Stock are not elected to be purchased by DAH pursuant to this Section 5, then JRH shall be free, for a period of ninety (90) calendar days from the date of the Proposed Transfer Notice, to sell the remaining shares of Transfer Stock to the Proposed Transferee, at a price equal to or greater than the purchase price specified in the Proposed Transfer Notice and upon

6

terms no more favorable to the Proposed Transferee than those specified in the Proposed Transfer Notice. Any transfer of the remaining shares of Transfer Stock by JRH after the end of such ninety (90) day period or any change in the terms of the sale as set forth in the Proposed Transfer Notice, which are more favorable to the Proposed Transferee, shall require a new Proposed Transfer Notice to be delivered to DAH and shall give rise anew to the rights provided in the preceding paragraphs.

6. <u>Miscellaneous</u>.

6.1 <u>Transfers, Successors[,] and Assigns</u>. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the Parties. JRH shall not assign this Agreement in whole or in part without the prior written consent of DAH, which may be withheld in DAH's discretion, and any attempted assignment without such consent shall be void ab initio. DAH may assign this Agreement in whole or in part, including without limitation the Right of First Refusal, without the consent of JRH. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

6.2 <u>No Fiduciary Duty</u>. JRH acknowledges and agrees that this Agreement is not intended to, and shall not create, any fiduciary obligations on the part of DAH to JRH, or any other special relationship between DAH and JRH, with respect to voting the Capital Stock or otherwise.

. . . .

6.6 <u>Titles and Subtitles</u>. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

. . . .

6.9 <u>Severability</u>. The invalidity o[r] unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

The agreements regarding Jacqueline's units in the limited liability companies provide,

## AGREEMENT:

NOW, THEREFORE, in consideration of the foregoing and the mutual promises contained herein, the Parties agree as follows:

1. <u>Voting Agreement</u>. JRH [Jacqueline] agrees to vote any Company Units beneficially owned by her in the manner and as directed by DAH [Daniel].

2. <u>Irrevocable Proxy</u>. In connection with the voting agreement in Section 1 above, JRH revokes any previously executed proxies and appoints DAH as her proxy to attend members' meetings, vote, execute consents, and otherwise act for JRH in the same manner as if she were personally present. **This proxy is irrevocable and is coupled with an interest.**

3. <u>Term</u>. This Agreement shall be effective as of the date hereof and shall continue in effect for a period of fifteen (15) years from the date hereof.

. . . .

5. <u>Restrictions on Transfer; Right of First Refusal</u>.

5.1 <u>Restrictions on Transfer</u>. JRH shall not assign sell, offer to sell, pledge, mortgage, hypothecate, encumber, liquidate, dispose of or otherwise transfer (a **"Transfer"**) any of Units of the Company other than in accordance with this Agreement. Any purported Transfer of Units by JRH or her successors or assigns (or any successor transferee or assignee) shall be ineffective until the transferee has agreed to become bound as an assignee of the rights and obligations of JRH (or such successor transferee or assignee) under this Agreement, including without limitation the voting agreement, irrevocable proxy and Right of First Refusal set forth herein.

5.2 <u>Transfer only to Current Unitholders</u>. Pursuant to the Property Agreement, JRH agrees that the Units received by JRH

under the Property Agreement can only be sold to other current unitholders of the Company.

5.3   Definitions.  As used herein, the following terms shall be defined as follows:

**"Proposed Transfer"** means any proposed Transfer of any Units (or any interest therein) proposed by JRH.

**"Proposed Transfer Notice"** means written notice from JRH to DAH setting for the terms and conditions of a Proposed Transfer.

**"Prospective Transferee"** means any person to whom JRH proposes to make a Proposed Transfer.

**"Right of First Refusal"** means the right, but not an obligation, of DAH to purchase some or all of the Transfer Units with respect to a Proposed Transfer, on the terms and conditions specified in the Proposed Transfer Notice.

**"ROFR Notice"** means written notice from DAH notifying JRH that he intends to exercise his Right of First Refusal as to some or all of the Transfer Units with respect to any Proposed Transfer.

**"Transfer Units"** means Units subject to a Proposed Transfer.

5.4   Grant.   JRH hereby unconditionally and irrevocably grants to DAH a Right of First Refusal to purchase all or any portion of the Units that JRH may propose to Transfer, at the same price and on the same terms and conditions as those offered to the Prospective Transferee.

5.5   Notice.  JRH must deliver DAH a notice regarding any proposed Transfer not later than 30 days prior to the consummation of such proposed Transfer.  Such Proposed Transfer Notice shall contain the material terms and conditions (including without limitation the purchase price therefore) of the Proposed Transfer and the identity of the Prospective Transferee.  DAH must exercise his Right of First Refusal under this Section 5 by giving a

ROFR Notice to [J]RH within fifteen (15) days after delivery of the Proposed Transfer Notice.

5.6 <u>Consideration; Closing</u>. If the consideration proposed to be paid for the Transfer Units is in property, services or other non-cash consideration, the fair market value of the consideration shall be determined in good faith by DAH. If DAH cannot for any reason pay for the Transfer Units in the same form of non-cash consideration, DAH may pay the cash value equivalent thereof. The closing of the purchase of Transfer Units by DAH shall take place, and all payments from DAH shall have been delivered to [J]RH, by the later of (i) the date specified in the Proposed Transfer Notice as the intended date of the Proposed Transfer and (ii) forty-five (45) days after delivery of the Proposed Transfer Notice.

5.7 <u>Sale by JRH; Restart of Right of First Refusal</u>. If any Transfer Units are not elected to be purchased by DAH pursuant to this Section 5, then JRH shall be free, for a period of ninety (90) calendar days from the date of the Proposed Transfer Notice, to sell the remaining Transfer Units to the Proposed Transferee, at a price equal to or greater than the purchase price specified in the Proposed Transfer Notice and upon terms no more favorable to the Proposed Transferee than those specified in the Proposed Transfer Notice. Any transfer of the remaining Transfer Units by JRH after the end of such ninety (90) day period or any change in the terms of the sale as set forth in the Proposed Transfer Notice, which are more favorable to the Proposed Transferee, shall require a new Proposed Transfer Notice to be delivered to DAH and shall give rise anew to the rights provided in the preceding paragraphs.

6. <u>Miscellaneous</u>.

6.1 <u>Transfers, Successors[,] and Assigns</u>. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the Parties. JRH shall not assign this Agreement in whole or in part without the prior written consent of DAH, which may be withheld in DAH's discretion, and any attempted assignment without such consent shall be void ab initio. DAH may assign this Agreement in whole or in part, including without limitation the Right of First Refusal, without the consent of JRH. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies,

obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

6.2 <u>No Fiduciary Duty</u>.  JRH acknowledges and agrees that this Agreement is not intended to, and shall not create, any fiduciary obligations on the part of DAH to JRH, or any other special relationship between DAH and JRH, with respect to voting the Units or otherwise.

. . . .

6.6 <u>Titles and Subtitles</u>.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

. . . .

6.9 <u>Severability</u>.  The invalidity o[r] unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

Jacqueline refused to sign the proposed voting agreements, so Daniel filed a petition for enforcement in December 2005, requesting that the trial court (1) compel Jacqueline to sign the agreements or hold her in contempt, (2) clarify any part of the divorce decree incorporating the AID that was not specific enough to be enforced by contempt, and (3) award attorney's fees.

Jacqueline filed an answer and counterpetition, arguing that Daniel failed to comply with the AID by (1) reserving interests in the shares of stock and units awarded Jacqueline when such interests were not agreed to in the AID or divorce decree, (2) issuing or causing to be issued shares of stock and units bearing restrictions, namely that the shares and units were subject to voting agreements that would bind subsequent purchasers, and (3) eliminating in the voting

11

agreements the fiduciary mandates imposed on trustees by law. Jacqueline also contended that the trial court's granting of Daniel's requested relief would violate section 9.007 of the family code by modifying the property division made in the divorce decree. Finally, Jacqueline contended that after receiving the "unacceptable documents" from Daniel, she had sent limited powers of attorney for each of the nine companies for his signature, which he refused. Jacqueline asked that the trial court order Daniel (1) to stop representing himself as the owner of the voting rights to her stock shares and units, (2) to stop representing that such rights survive the transfer of the shares and units and bind subsequent purchasers, and (3) to assign, convey, and deliver her shares and units to her in her name "without any restrictions thereon or on record with any Company, other than notice of [Daniel's] right of first refusal and that said shares and units may only be sold to other shareholders or members."

The trial court held hearings on February 6 and February 24, 2006. At the February 24 hearing, Daniel's counsel stated,

> I don't agree with their interpretation on the right of first refusals, but [they] raise an issue about that. We don't care. I took it out and made it an all—not that I'm conceding the position, but to remove that issue from the case I adopted their language and I attached a new—

On March 9, 2006, the trial court signed an order finding,

> 1) the following language contained in paragraph 1.2 on page 15 of 28 of the Agreement Incident to Divorce:
>
> > . . . Jacquel[ine] . . . hereby agrees that she will execute all documents necessary to permit Daniel . . . to

12

> exercise voting rights relating to the shares of stock or units awarded to her herein, including, but not limited to, limited powers of attorney or the placement of the shares of stock into a voting trust as determined by Daniel . . .

> is not ambiguous and requires Jacqueline . . . to sign and execute all documents necessary and in a form as determined by and at the sole discretion of Daniel . . . ;

ordering Jacqueline to sign within ten days the nine original voting agreements attached to Daniel's petition for enforcement; and awarding attorney's fees to Daniel "through the hearing on this matter."

On March 13, 2006, Jacqueline filed a petition for mandamus in this court requesting that we compel the trial court to vacate its March 9, 2006 order and that we stay that order pending the resolution of the original proceeding. On March 17, 2006, we stayed the trial court's March 9, 2006 order; on April 24, 2006, we lifted the stay and denied mandamus relief.

On May 2, 2006, the trial court signed a supplemental clarification order requiring Jacqueline to sign and deliver the nine voting agreements by 5:00 p.m. on May 3, 2006. On May 4, 2006, Daniel filed his first amended petition for enforcement, complaining that Jacqueline had not delivered the nine voting agreements, seeking that she be held in contempt and jailed until she complied with the trial court's orders, requesting attorney's fees, and to the extent that the orders sought to be enforced were not specific enough to be enforced by contempt, seeking clarification.

13

By May 5, 2006, the parties had modified the voting agreements under a rule 11 agreement, and Jacqueline had signed them. The modified voting agreements have different language concerning Daniel's right of first refusal. The modified voting agreements regarding the stock provide,

> 5.3. <u>Definitions</u>. As used herein, the following terms shall be defined as follows:
>
> . . . .
>
> **"Right of First Refusal"** means the right, but not an obligation, of DAH to purchase *all* of the Transfer Stock with respect to a Proposed Transfer, on the terms and conditions specified in the Proposed Transfer Notice.
>
> **"ROFR Notice"** means written notice from DAH notifying JRH that he intends to exercise his Right of First Refusal as to ~~some or~~ *all* of the Transfer Stock with respect to any Proposed Transfer.
>
> . . . .
>
> 5.4 <u>Grant</u>. JRH hereby unconditionally and irrevocably grants to DAH a Right of First Refusal to purchase *all* ~~or any portion~~ of the Capital Stock that JRH may propose to Transfer, at the same price and on the same terms and conditions as those offered to the Prospective Transferee.
>
> . . . .
>
> 5.7 <u>Sale by JRH; Restart of Right of First Refusal</u>. If any shares of Transfer Stock are not elected to be purchased by DAH pursuant to this Section 5, then JRH shall be free, for a period of ninety (90) calendar days from the date of the Proposed Transfer Notice, to sell the ~~remaining~~ shares of Transfer Stock to the Proposed Transferee, at a price equal to or greater than the purchase price specified in the Proposed Transfer Notice and upon terms no more favorable to the Proposed Transferee than those specified in the Proposed Transfer Notice. Any transfer of the ~~remaining~~ shares of Transfer Stock by JRH after the end of such

14

ninety (90) day period or any change in the terms of the sale as set forth in the Proposed Transfer Notice, which are more favorable to the Proposed Transferee, shall require a new Proposed Transfer Notice to be delivered to DAH and shall give rise anew to the rights provided in the preceding paragraphs.  [Emphasis added.]

The modified voting agreements concerning the units in the limited liability companies provide,

> 5.3.   Definitions.   As used herein, the following terms shall be defined as follows:
>
> . . . .
>
> **"Right of First Refusal"** means the right, but not an obligation, of DAH to purchase *all* of the Transfer Units with respect to a Proposed Transfer, on the terms and conditions specified in the Proposed Transfer Notice.
>
> **"ROFR Notice"** means written notice from DAH notifying JRH that he intends to exercise his Right of First Refusal as to ~~some or~~ *all* of the Transfer Units with respect to any Proposed Transfer.
>
> . . . .
>
> 5.4   Grant.   JRH hereby unconditionally and irrevocably grants to DAH a Right of First Refusal to purchase *all* ~~or any portion~~ of the Units that JRH may propose to Transfer, at the same price and on the same terms and conditions as those offered to the Prospective Transferee.
>
> . . . .
>
> 5.7   Sale by JRH; Restart of Right of First Refusal.   If any Transfer Units are not elected to be purchased by DAH pursuant to this Section 5, then JRH shall be free, for a period of ninety (90) calendar days from the date of the Proposed Transfer Notice, to sell the ~~remaining~~ Transfer Units to the Proposed Transferee, at a price equal to or greater than the purchase price specified in the Proposed Transfer Notice and upon terms no more favorable to the Proposed Transferee than those specified in the Proposed Transfer Notice.

15

Any transfer of the ~~remaining~~ Transfer Units by JRH after the end of such ninety (90) day period or any change in the terms of the sale as set forth in the Proposed Transfer Notice, which are more favorable to the Proposed Transferee, shall require a new Proposed Transfer Notice to be delivered to DAH and shall give rise anew to the rights provided in the preceding paragraphs. [Emphasis added.]

Also on May 5, 2006, Jacqueline filed her supplemental response to Daniel's first amended petition for enforcement. She discussed the rule 11 agreement, noting that she had signed the revised voting agreements involuntarily solely to avoid being held in contempt and that she did not waive her right to appeal, and she stated that this postdeadline agreement would bar a contempt finding against her.

On May 16, 2006, the trial court held a hearing. The trial court indicated that Jacqueline would need to sign the original voting agreements to avoid being found in contempt and that the parties could not agree around the trial court's order. The parties notified the trial court in the hearing that they were going to attempt to globally settle the property issues, and the trial court ordered Jacqueline's attorney to file a status report two weeks later.

Also on May 16, Jacqueline filed her second supplemental response to Daniel's first amended petition for enforcement, attaching her signed voting agreements in their original form. Jacqueline's response stated that she was signing the voting agreements in their original form only to avoid being held in contempt and placed in jail and that she fully intended to appeal the trial court's

16

order compelling her to sign the original voting rights agreements. No final settlement of the property issues appears in the record.

In early June 2006, Jacqueline attempted to appeal the trial court's orders of March 9, 2006 and May 2, 2006. We dismissed that appeal for want of jurisdiction because neither order finally disposed of attorney's fees.[2] Almost three years later, on May 28, 2009, the trial court entered a final clarification order awarding Daniel a judgment against Jacqueline for $35,000 "for attorney's fees through the trial of the petition for enforcement and responding to the petition for mandamus" and conditional amounts in appellate fees. Jacqueline timely appealed.

## II. Law and Analysis

Because Daniel and Jacqueline stipulated that their AID is enforceable as a contract, the AID's construction is governed by contract law. Neither party raised ambiguity below or on appeal. In fact, both parties agreed below that the contract is not ambiguous, and that issue is not raised on appeal.[3] The trial court found that the AID is not ambiguous, and we agree.

Accordingly, we construe the AID as a matter of law, with our chief objective being to determine the parties' true intent as expressed in the

---

[2]*Henderson v. Henderson*, No. 02-06-00195-CV, 2006 WL 2692568, at *1 (Tex. App.—Fort Worth Sept. 21, 2006, no pet.) (mem. op.).

[3]*See Praeger v. Wilson*, 721 S.W.2d 597, 600 (Tex. App.—Fort Worth 1986, writ ref'd n.r.e.).

17

document.[4]  To accomplish this task, we review the entire AID "to harmonize and give effect to *all [its] provisions* . . . so that none will be rendered meaningless."[5]

Section 9.007 of the family code provides,

(a) A court may not amend, modify, alter, or change the division of property made or approved in the decree of divorce or annulment. An order to enforce the division is limited to an order to assist in the implementation of or to clarify the prior order and may not alter or change the substantive division of property.

(b) An order under this section that amends, modifies, alters, or changes the actual, substantive division of property made or approved in a final decree of divorce or annulment is beyond the power of the divorce court and is unenforceable.[6]

We must therefore determine whether the trial court's order to sign the voting agreements in their original form impermissibly modifies the AID, which we construe as a matter of law.

Jacqueline complains that the voting agreements modify the AID by (1) giving Daniel the irrevocable, fully transferable right to vote her stock shares and units even after she sells them, binding subsequent purchasers; (2) giving Daniel a fully transferable right of first refusal that could be exercised piecemeal; and (3)

---

[4]*See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

[5]*Id.*

[6]Tex. Fam. Code Ann. § 9.007(a), (b) (Vernon 2006).

abrogating any fiduciary duty that Daniel would have to Jacqueline concerning his voting of her stock and units.[7]

## A. Daniel's Rights to Vote Shares Awarded to Jacqueline

Jacqueline complains that the following terms in the voting agreements regarding the stock modify the AID:

> 2.    Irrevocable Proxy.    In connection with the voting agreement in Section 1 above, JRH revokes any previously executed proxies and appoints DAH as her proxy to attend shareholders' meetings, vote, execute consents, and otherwise act for JRH in the same manner as if she were personally present. **This proxy is irrevocable and is coupled with an interest.**
>
> 3.    Term.    This Agreement shall be effective as of the date hereof and shall continue in effect for a period of fifteen (15) years from the date hereof.

Similarly, she complains about these corresponding provisions in the voting agreements regarding the units:

> 2.    Irrevocable Proxy.    In connection with the voting agreement in Section 1 above, JRH revokes any previously executed proxies and appoints DAH as her proxy to attend members' meetings, vote, execute consents, and otherwise act for JRH in the same manner as if she were personally present. **This proxy is irrevocable and is coupled with an interest.**
>
> 3.    Term.    This Agreement shall be effective as of the date hereof and shall continue in effect for a period of fifteen (15) years from the date hereof.

Jacqueline contends that the AID gave her "[o]ne half of the parties' ownership" in the companies and that nowhere in the AID or divorce decree is Daniel given

---

[7]Construing Jacqueline's brief liberally, we treat her use of "stock" alone to implicitly include "units."

19

an ownership interest in the right to vote the shares of stock or units. Jacqueline contends that the clear intent of the stock and unit restrictions in the AID is to exclude her from any involvement in the businesses. She also contends that once she sells her stock or units in a company, any concern regarding her involvement in the company would naturally end; therefore, she argues,

> Clearly, then, any right granted by the AID to Daniel to exercise the vote of Jacqueline's shares would end when Jacqueline's stock is sold. The express terms of the AID further bear this out in that the documents listed in the relevant paragraph in the AID are limited powers of attorney and voting trusts, both of which would terminate upon sale of the stock.

Yet, construing the unappealed AID to give effect to the parties' expressed intent, we note that the plain language of the AID does not expressly limit Daniel's rights to vote Jacqueline's shares and units to her period of ownership of the shares and units, nor does the AID provide that Daniel's rights to vote the shares and units terminate upon Jacqueline's transfer of them. Rather, the AID expressly gives Daniel the right "to exercise voting rights relating to the shares of stock or units" awarded Jacqueline and provides that Jacqueline's ownership of the shares or units does *not* include the right to vote: "Jacqueline . . . hereby agrees that she will not have the right to vote pursuant to her ownership of such stock or units."

Further, the AID expressly provides that its terms and conditions "shall inure to the benefit of and be binding upon the respective successors and assigns of the Parties." We therefore agree with Daniel that the AID does not

20

provide that his rights to vote the shares and units awarded Jacqueline somehow revest in Jacqueline so that she can transfer unencumbered shares or units to her respective successors and assigns.

Finally, Jacqueline argues that the provision in the AID requiring her to

> execute all documents necessary to permit Daniel . . . to exercise voting rights relating to the shares of stock or units awarded to her herein, including, but not limited to, limited powers of attorney or the placement of the shares of stock into a voting trust as determined by Daniel . . . .

means that Daniel must

> choose either (1) a limited power of attorney, or (2) . . . a voting trust, plus whatever other documents may be necessary to effectuate the stock restrictions. . . . The AID, thus, intended the execution, at a minimum, of either a limited power of attorney or a voting trust.

Jacqueline concludes that because a trust and limited power of attorney would terminate upon the sale of the affected shares or units, this provision of the AID is further evidence of the parties' intent that she have the ability to transfer the voting rights to her shares and units. Yet Jacqueline's interpretation ignores the broadening language of the AID provision: "including, but not limited to." This we cannot do.[8]

Accordingly, because we hold that the AID expressly gives Daniel the right to vote Jacqueline's shares or units, expressly provides that Jacqueline has no voting rights regarding her shares or units, expressly contemplates that their successors and assigns have the same rights and duties as Daniel and

---

[8]*See Coker*, 650 S.W.2d at 393.

21

Jacqueline under the AID, expressly gives Daniel the discretion to determine which documents are necessary to allow him to exercise his voting rights of Jacqueline's shares and units, and does not expressly limit Daniel's rights to vote such shares and units to Jacqueline's period of ownership thereof, we hold that the voting agreements and the trial court's order compelling Jacqueline to sign them do not impermissibly modify the AID regarding the voting rights. We overrule Jacqueline's argument concerning the voting rights to the shares and units awarded her.

### B. Daniel's Fiduciary Duties to Jacqueline

Jacqueline also complains that the voting agreements impermissibly modify the AID by eliminating Daniel's fiduciary duties to her regarding the voting of her stock and units. The plain language of the voting agreements regarding the stock provides: "JRH acknowledges and agrees that this Agreement is not intended to, and shall not *create*, any fiduciary obligations on the part of DAH to JRH, or any other special relationship between DAH and JRH, with respect to voting the Capital Stock or otherwise." [Emphasis added.] And the plain language of the voting agreements regarding the units provides, "JRH acknowledges and agrees that this Agreement is not intended to, and shall not *create*, any fiduciary obligations on the part of DAH to JRH, or any other special relationship between DAH and JRH, with respect to voting the Units or otherwise." [Emphasis added.]

22

Relying on the plain language, then, the voting agreements do not address fiduciary duties that Daniel may or may not otherwise have to Jacqueline,[9] an issue not before us; rather, the voting agreements expressly do not enlarge any fiduciary duties Daniel may have. Because the voting agreements do not limit any fiduciary duties that Daniel otherwise has to Jacqueline, we overrule Jacqueline's argument that the voting agreements impermissibly modify the AID by eliminating Daniel's fiduciary duties to her.

## C. Right of First Refusal

Jacqueline's contention that the voting agreements modify the AID by allowing Daniel to exercise his right of first refusal piecemeal, however, has merit. A person with a right of first refusal, also called a preemptive or preferential right, has the right to purchase property, shares of corporate stock and units of a limited liability company in this case, on the same terms as a bona fide purchaser.[10] Exercise of the right "must be positive, unconditional, and unequivocal. . . . [G]enerally, a purported acceptance containing a new demand, proposal, condition, or modification of the terms of the offer is not an acceptance

---

[9]*See, e.g.*, *Hogget v. Brown*, 971 S.W.2d 472, 487–88 (Tex. App.— Houston [14th Dist.] 1997, pet. denied).

[10]*Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 644 (Tex. 1996).

23

but a rejection."[11]  We must narrowly construe rights of first refusal because they restrict the free transfer of stock.[12]

The AID provides,

> Jacqueline . . . hereby agrees that Daniel . . . is hereby awarded a right of first refusal to purchase the stock or units awarded herein to [her].  Jacqueline . . . hereby agrees that she will execute all documents necessary to confirm the right of first refusal as provided herein.

The original voting agreements regarding the stock that the trial court required Jacqueline to sign, however, define the right of first refusal as "the right, but not an obligation, of DAH [Daniel] to purchase some or all of the Transfer Stock with respect to a Proposed Transfer, on the terms and conditions specified in the Proposed Transfer Notice" and provide that "JRH [Jacqueline] hereby unconditionally and irrevocably grants to DAH a Right of First Refusal to purchase all or any portion of the Capital Stock that JRH may propose to Transfer, at the same price and on the same terms and conditions as those offered to the Prospective Transferee."  Similarly, the original voting agreements regarding the units that the trial court required Jacqueline to sign define the right of first refusal as "the right, but not an obligation, of DAH to purchase some or all of the Transfer Units with respect to a Proposed Transfer, on the terms and conditions specified in the Proposed Transfer Notice" and provide that "JRH

---

[11]*FWT, Inc. v. Haskin Wallace Mason Prop. Mgmt., L.L.P.*, 301 S.W.3d 787, 794 (Tex. App.—Fort Worth 2009, pet. denied) (op. on reh'g).

[12]*Tenneco,* 925 S.W.2d at 646.

hereby unconditionally and irrevocably grants to DAH a Right of First Refusal to purchase all or any portion of the Units that JRH may propose to Transfer, at the same price and on the same terms and conditions as those offered to the Prospective Transferee."

As Jacqueline argues, in drafting the original voting agreements, Daniel has "unilaterally translated his right of first refusal to allow him to accept or reject that right piecemeal, . . . [i]n essence, . . . giv[ing] himself the ability to destroy any deal Jacqueline may have to sell her shares [or units]." The AID gave him no such authority. Accordingly, because the original voting agreements extend the reach of the right of first refusal beyond the terms of the AID, we hold that the provisions regarding the right of first refusal in the original voting agreements (other than those in subsection "B" of the "Recitals" section) are void and that the trial court abused its discretion by ordering Jacqueline to sign the original voting agreements.

We therefore modify the trial court's orders accordingly.[13] Specifically, we modify the following provisions in the March 9, 2006 clarification order:

> 3) the 9 documents provided by Petitioner to Respondent on July 13, 2005 and attached as Exhibits 1 through 9 of Petitioner's Petition for Enforcement filed with this Court on December 13, 2005,

---

[13]*See, e.g., In re S.A.D.S.*, No. 02-09-00302-CV, 2010 WL 3193520, at *4 (Tex. App.—Fort Worth Aug. 12, 2010, no pet.) (modifying conservatorship order that varied from mediated settlement agreement and affirming as modified); *Garcia-Udall v. Udall*, 141 S.W.3d 323, 332 (Tex. App.—Dallas 2004, no pet.) (modifying order modifying divorce decree to comport with mediated settlement agreement and affirming as modified).

comply with the provision contained in paragraph 1.2 on page 15 of 28 of the Agreement Incident to Divorce;

. . . .

IT IS THEREFORE ORDERED that . . . Jacqueline . . . shall sign the 9 documents attached as Exhibits 1 through 9 of Petitioner's Petition for Enforcement . . . .

to now read,

3) the 9 documents provided by Petitioner to Respondent on July 13, 2005 and attached as Exhibits 1 through 9 of Petitioner's Petition for Enforcement filed with this Court on December 13, 2005, *with all provisions regarding the right of refusal (other than those in subsection "B" of the "Recitals" section) redacted,*[14] comply with the provision contained in paragraph 1.2 on page 15 of 28 of the Agreement Incident to Divorce;

. . . .

IT IS THEREFORE ORDERED that . . . Jacqueline . . . shall sign the 9 documents attached as Exhibits 1 through 9 of Petitioner's Petition for Enforcement, *with all provisions regarding the right of refusal (other than those in subsection "B" of the "Recitals" section) redacted*. [Emphasis added.]

Similarly, we modify the following provision in the May 2, 2006 clarification order:

IT IS THEREFORE ORDERED that Jacqueline . . . is ordered to sign the 9 Voting Agreements attached as Exhibits 1 through 9 to Petitioner's Petition for Enforcement filed with this Court on December 13, 2005 as referenced in the March 9, 200[6] Clarification Order Pursuant to Tex. Fam. Code § 9.008 . . . .

to now read,

IT IS THEREFORE ORDERED that Jacqueline . . . is ordered to sign the 9 Voting Agreements attached as Exhibits 1 through 9 to

---

[14]We note that the provisions in the AID regarding Daniel's right of first refusal remain intact.

26

Petitioner's Petition for Enforcement filed with this Court on December 13, 2005, *with all provisions regarding the right of refusal (other than those in subsection "B" of the "Recitals" section) redacted,* as referenced in the March 9, 200[6] Clarification Order Pursuant to Tex. Fam. Code § 9.008 . . . . [Emphasis added.]

## III. Conclusion

Having held that the trial court abused its discretion by ordering Jacqueline to sign the original voting agreements because the language regarding Daniel's right of first refusal did not comply with the AID but having held that the trial court did not otherwise abuse its discretion, we affirm the trial court's orders as modified.

LEE ANN DAUPHINOT
JUSTICE

PANEL:  LIVINGTON, C.J.; DAUPHINOT and MCCOY, JJ.

DELIVERED:  December 2, 2010