# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH
### NO. 02-12-00094-CV


| | |
|---|---|
| LOCH 'N' GREEN VILLAGE SECTION TWO HOMEOWNERS ASSOCIATION, INC. | APPELLANT |

V.

| | |
|---|---|
| SHARON MURTAUGH, CONNIE J. RAGSDALE, PAMELA L. JOHNSTON, EILEEN GREENE, AND RUSSELL GREENE | APPELLEES |

----------

FROM THE 153RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant Loch 'n' Green Village Section Two Homeowners Association, Inc. (appellant or the Homeowners Association) appeals the trial court's order granting the motion for summary judgment filed by appellees Sharon Murtaugh,

---

[1]See Tex. R. App. P. 47.4.

Connie J. Ragsdale, Pamela L. Johnston, Eileen Greene, and Russell Greene. We affirm.

## Background Facts

The City of Arlington's (the City's) Lake Interlochen Subdivision, which a real estate company began developing in 1972, has two water reservoirs. The Lake Interlochen Homeowners Association (Interlochen), representing a collection of property owners in the subdivision, eventually became responsible for operating the reservoirs.

In 1980, Coventry Southwest, Inc. (Coventry) purchased almost fifty acres of land near one of the reservoirs. In 1982, to settle litigation that was pending in a Tarrant County district court concerning Interlochen's protest of Coventry's application to "enlarge the 136 acre foot reservoir by impounding an additional 15 acre-foot of water on [Coventry's] tract," Coventry entered into an agreement with Interlochen. Through the agreement, Coventry joined with Interlochen on the permit for the reservoir. Also, among other stipulations, Coventry agreed to

> set up a homeowners association which may be called, and will hereinafter be referred to as, Loch-N-Green Homeowners' Association, and that said association will share in the future costs of operating and maintaining the upstream dam impounding the 136 acre-foot reservoir. . . . This covenant by Coventry shall run with the land.

Coventry also agreed that the homeowners association would make a "pro rata contribution for the cost of maintaining the supply reservoir." Finally, Coventry agreed to "require initial purchasers that [became] members of Loch-N-Green

2

Homeowners Association to execute an affidavit acknowledging that operation of the reservoir is controlled by [Interlochen] . . . and that the obligations . . . of Coventry, its assigns and successors in title, [ran] with the land."

In 1983, Coventry entered into an agreement with the City in which Coventry assented that the City was not responsible for developing, constructing, operating, or maintaining improvements in Coventry's planned subdivision and that Coventry would "impose by covenants running with the land . . . the obligation upon each lot abutting and benefitted by such improvements the joint obligation of maintaining and operating such improvements."  Coventry's agreement with the City did not expressly address the creation of a homeowners association.

Coventry filed a plat of "Loch 'n' Green Village" in 1983, but no evidence exists that Coventry developed the land there or ever created a homeowners association.  Instead, in 1985, Loch 'n' Green Joint Venture (the Joint Venture), which had acquired the land, filed a revised plat of the planned subdivision.  The revised plat dedicated the subdivision's streets to the public's use.  The Joint Venture entered into an agreement with the City in 1986 in which the Joint Venture assented, like Coventry had, that the city would not be responsible for developing, constructing, operating, or maintaining the improvements in the subdivision.  The Joint Venture, however, apparently also did not develop the property.  In 1986, the Joint Venture sold six lots of the property, lots 27 through

32 of Block 2, to Terra-One Partnership. The Joint Venture later filed for bankruptcy.

Some lots that had previously been owned by the Joint Venture were eventually acquired by JMH Investments, Inc. (JMH), and in 1993, that company filed a "DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS" (the Original Declaration). The Original Declaration mandated that all of the land in the "Addition," which expressly did not include lots 27 through 32 of Block 2, was to be "held, sold and conveyed subject to" the conditions in the Original Declaration. The Original Declaration included building, architecture, landscaping, and use restrictions; created the Homeowners Association for only "the owners of the lots in the Addition";[2] required the owner of each lot to pay annual assessments to be used for a "maintenance fund exclusively for the use and benefit of the Addition"; and stated that the Original Declaration was binding on "every person acquiring title to any lot in the Addition." The Original Declaration also stated,

> Pursuant to that certain Settlement Agreement . . . between [Interlochen] . . . and [Coventry] . . . the [Homeowners Association] . . . shall share with [Interlochen] the reasonable and necessary operating and maintenance costs of the upstream dam impounding the 136 acre-foot reservoir . . . .

---

[2]The Homeowners Association is, according to an affidavit filed in the trial court, a "separate and distinct entity and is not the successor of any other entity." The affidavit recites that the Homeowners Association was incorporated in August 1993 as a Texas nonprofit corporation.

Through letters sent by JMH's agent in August 1993 concerning the proposed privatization of streets within the Loch 'n' Green Section Two subdivision, JMH expressed to owners of lots 29 and 31 that they would not be compelled to join the Homeowners Association but could do so if they desired.

JMH later amended the Declaration (the First Amended Declaration) "to extend the coverage of the scheme of development restrictions . . . to certain additional lots which were not owned by [JMH] on the date of the Original Declaration." But like the Original Declaration, the First Amended Declaration did not apply to lots 27 through 32 of Block 2 of Loch 'n' Green Village Section Two. The First Amended Declaration stated that the maintenance fund from homeowners' assessments could be used only for common areas and for "the use and benefit of lots which [were] covered by" the First Amended Declaration. An amendment to the amended declaration (the Second Amended Declaration) again clearly expressed that its terms did not apply to lots 27 through 32 of Block 2.

The record indicates that by 1993, when JMH filed the Original Declaration, each of the lots now owned by appellees had already been conveyed to private individuals. Appellant Sharon Murtaugh acquired lot 27 of Loch 'n' Green Village Section Two in 1999. Murtaugh's warranty deed expressed that the conveyance to her was "subject to any and all restrictions, . . . covenants and conditions, if any," relating to the lot. Appellee Pamela L. Johnston purchased lot 30 in 2003 "subject to any and all . . .

5

restrictions . . . affecting said property that [were] filed for record" in Tarrant County. Appellee Connie J. Ragsdale bought lot 28 in October 2006. Ragsdale's deed stated that the conveyance was "made subject to all . . . restrictions, easements, exceptions, conditions, and covenants, if any, applicable to and enforceable against" her property. Appellees Eileen Greene and Russell Greene purchased lot 32 in September 2007; the house on the lot had been built in 1986. The Greenes' general warranty deed recited that the conveyance to them was "made subject to . . . [r]estrictions, covenants, [and] easements, . . . if any, shown of record" at the time of the conveyance. None of appellees' deeds expressly mentioned the Homeowners Association or said that appellees were subject to the original Declaration or any of its amendments.

In 2009 or 2010, a homeowner in Loch 'n' Green Village began conducting a business at the home, which caused a parking dispute between neighbors. According to an affidavit from William Ridgeway, who was the president of the Homeowners Association at the time, appellees responded to the parking dispute by painting "Reserved Parking" on the curbs in front of their homes.

In August 2010, appellant sued appellees and three other defendants.[3] In appellant's second amended petition, which appellant filed in June 2011, it

---

[3]The trial court later granted summary judgment to the three defendants in the trial court who are not appellees in this appeal, and the court severed appellant's claims against those defendants. The order granting summary judgment to those three defendants stated that they were "not required to fulfill any responsibilities, duties or obligations incident to membership" in the Homeowners Association.

alleged that appellees had refused to "comply with the terms of the Declaration or to remit assessments to the Association." Appellant further asserted, "Each of the [appellees] took title to the . . . properties subject to the agreements with Interlochen and the City of Arlington and became obligated to pay their pro-rata share of the cost of maintenance and operation of the items set out therein." In the same paragraph of the second amended petition in which appellant contended that appellees were "obligated to pay . . . maintenance assessments," appellant stated that it was seeking a "declaratory judgment[4] that [appellees'] lots [were] subject to the terms of the Declaration and that [appellees were] bound thereby." Appellant also requested a permanent injunction to prevent appellees from painting parking spaces on the street adjacent to their property.

In answering appellant's lawsuit, appellees contended that appellant had waived any right to compel them to become members of the Homeowners Association and that appellees had reasonably relied on appellant's "inaction over the 16 year period during which [appellant had] been in existence, thereby excusing [appellees] of any obligations to . . . [appellant]." Appellees also brought a counterclaim for declarations that their lots are excluded from mandatory membership in the Homeowners Association, that they are not bound by the "terms of the Declaration of Covenants and Restrictions for Loch 'N' Green Village Section Two," and that they are required only to "use and maintain their

---

[4]*See* Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001–.011 (West 2008).

7

respective properties in a manner not inconsistent with the general development scheme that existed in the subdivision" when their properties were first sold. Appellant answered appellees' counterclaim by contending that appellees were estopped from asserting that they were not subject to the declarations because they "each signed a planned unit development rider in their deeds of trust . . . in which they acknowledged that their Lots were part of the Loch 'N' Green planned unit development."[5]

Appellees filed a traditional motion for summary judgment. In the motion, appellees contended that appellant's claim was barred by a four-year statute of limitations, by laches, and by waiver.[6] Appellees also argued that under the evidence that they attached to their motion, they were, as a matter of law, excluded from mandatory membership in the Homeowners Association. Appellant responded to the motion, contending that appellees were required by a restrictive covenant or an equitable servitude to become members of the Homeowners Association based, in part, on the agreements between Coventry and Interlochen and between Coventry and the City.

---

[5]In the trial court, appellant did not raise estoppel through a dispositive motion or discuss estoppel in its response to appellees' motion for summary judgment on the affirmative defense of waiver, which we conclude to be dispositive of the issues in this appeal.

[6]Appellant objected to all of appellees' summary judgment evidence on various grounds, including that appellees had allegedly not properly responded to discovery before filing the summary judgment motion. The trial court denied all of appellant's objections. Appellant does not complain about these rulings on appeal.

The trial court granted summary judgment for appellees, stating that appellant was to take nothing by its causes of action. In the summary judgment order, the trial court declared that membership in the Homeowners Association was "voluntary with respect to [appellees]" and that appellees were not required to fulfill any responsibilities incident to membership in the Homeowners Association. The trial court also awarded attorney's fees and costs to appellees. Appellant brought this appeal.

**The Propriety of the Trial Court's Summary Judgment Order**

In three issues, appellant challenges the trial court's order granting appellees' motion for summary judgment. Appellant contends that the summary judgment evidence shows that appellees had constructive notice of the covenants creating the Homeowners Association, fails to conclusively establish appellees' affirmative defenses, and fails to establish that the covenants cannot be enforced against appellees.

In a summary judgment case, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *State v. Ledrec, Inc.*, 366 S.W.3d 305, 307–08 (Tex. App.—Fort Worth 2012, no pet.). We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding

9

evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). Because the trial court did not specify the ground relied on for granting summary judgment, we must affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Hanson v. Greystar Dev. & Constr., LP*, 317 S.W.3d 850, 852 (Tex. App.—Fort Worth 2010, pet. denied).

In appellant's second issue, it contends in part that the trial court improperly granted appellees' motion for summary judgment on the affirmative defense of waiver. A defendant is entitled to summary judgment on an affirmative defense if the defendant conclusively proves all the elements of the affirmative defense. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508–09 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c). To accomplish this, the defendant-movant must present summary judgment evidence that conclusively establishes each element of the affirmative defense. *See Chau v. Riddle*, 254 S.W.3d 453, 455 (Tex. 2008). Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence that raises a fact issue. *Van v. Pena*, 990 S.W.2d 751, 753 (Tex. 1999); *Rice v. Metro. Life Ins. Co.*, 324 S.W.3d 660, 665 (Tex. App.—Fort Worth 2010, no pet.).

Appellees sought summary judgment in the trial court on the basis, among others, that appellant had waived any right to enforce restrictions against appellees and had waived any right to compel appellees to join the Homeowners Association. Waiver is an affirmative defense. *See* Tex. R. Civ. P. 94; *White v. Harrison*, 390 S.W.3d 666, 673 (Tex. App.—Dallas 2012, no pet.). "The affirmative defense of waiver can be asserted against a party who intentionally relinquishes a known right or engages in intentional conduct inconsistent with claiming that right." *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996); *see Finkelstein v. Southampton Civic Club*, 675 S.W.2d 271, 278 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.).

Thus, the elements of waiver "include (1) an existing right, benefit, or advantage held by a party; (2) the party's actual or constructive knowledge of its existence; and (3) the party's actual intent to relinquish the right or intentional conduct inconsistent with the right." *Perry Homes v. Cull*, 258 S.W.3d 580, 602–03 (Tex. 2008), *cert. denied*, 555 U.S. 1103 (2009). Waiver may be proved by a party's express renunciation of an actually or constructively known right or by "[s]ilence or inaction . . . for so long a period as to show an intention to yield the known right." *Tenneco Inc.*, 925 S.W.2d at 643. A party asserting waiver of a restrictive covenant or deed restriction must prove either that the party seeking enforcement of the covenant or restriction has acquiesced in such substantial violations to amount to abandonment of the covenant or restriction or that there has been such a change of conditions in the restricted area or the area

11

surrounding it that it is no longer possible to secure in a substantial degree the benefits sought to be realized through the covenant. *K.M. Van Zandt Land Co. v. Whitehead Equities, JV*, No. 02-06-00294-CV, 2008 WL 2510602, at *2 (Tex. App.—Fort Worth June 19, 2008, pet. denied) (mem. op.) (citing *Cowling v. Colligan*, 158 Tex. 458, 462, 312 S.W.2d 943, 945 (1958)); *see also Traeger v. Lorenz*, 749 S.W.2d 249, 250 (Tex. App.—San Antonio 1988, no writ) (recognizing that in *Cowling*, the supreme court identified "two distinct rules of law by which enforcement of . . . restrictions may be refused").

Appellees' summary judgment evidence establishes that in 1993, the Original Declaration, which JMH filed of record, defined the "Addition" that was to be subject to the Original Declaration as excluding the lots that appellees now own. The Original Declaration stated that its purpose was to promote the "development of the Addition" by placing certain "restrictions on the property comprising the Addition." Section 2.1 of the Original Declaration expressed that all of the land "in the Addition" was to be subject to the conditions and restrictions in the Original Declaration. That section also stated that the restrictions and covenants in the Original Declaration were "made for the mutual and reciprocal benefit of each and every owner of any portion of the land *within the Addition*." [Emphasis added.] Section 7.1 required membership in the Homeowners Association only for the "owners of lots in the Addition." Other parts of the Original Declaration, including provisions related to use restrictions, pet restrictions, construction restrictions, and fee assessments, expressly limited

12

their scope to lots contained within the Addition. Section 8.3 stated that the Homeowners Association was to use the proceeds of the assessments "exclusively for the use and benefit of the Addition."

James Helzer, the president of JMH in October 1993, signed the Original Declaration. In June 1994, Helzer signed the First Amended Declaration, which, like the Original Declaration, particularly excluded the lots that appellees now own from the effects of its provisions. For example, the First Amended Declaration defined "lots" as the "individual plots of land in the Addition which are described in the recitals to this Declaration." A recital in the First Amended Declaration excluded the lots now owned by appellees. Section 2.2 of the First Amended Declaration expressed, "[A]ll of the *lots* shall be held . . . subject to the . . . restrictions contained in this Declaration." [Emphasis added.] Section 7.1 of the First Amended Declaration stated that owners of "lots" were required to join the Homeowners Association and that membership could "not be separated from . . . ownership of a lot."

In June 1995, JMH and appellant jointly filed the Second Amended Declaration. The Second Amended Declaration incorporated terms of the First Amended Declaration and, like the previous declarations, the Second Amended Declaration expressly excluded appellees' lots. Helzer signed the Second Amended Declaration as the president of both JMH and of appellant. The record does not show any attempt by appellant to amend the Second Amended Declaration after 1995 so that it could include appellees' lots.

13

We conclude that these facts concerning the content, filing, and signing of the three declarations, each of which expressly omitted appellees' lots from their scope, clearly establish that appellant engaged in intentional conduct that is inconsistent with claiming that appellees should now be subject to the terms of the declarations. *See Tenneco Inc.*, 925 S.W.2d at 643; *Palladian Bldg. Co. v. Nortex Found. Designs, Inc.*, 165 S.W.3d 430, 434 (Tex. App.—Fort Worth 2005, no pet.) (explaining that when facts are clearly established, waiver becomes a question of law). Similarly, because provisions concerning the enforcement of the agreements between Coventry and Interlochen and between the Joint Venture and the City were included as terms of the declarations that excluded appellees' lots, we hold that appellant engaged in intentional conduct that is inconsistent with any right it has to enforce those agreements against appellees.[7] *See Tenneco Inc.*, 925 S.W.2d at 643.

Next, we conclude that according to the summary judgment evidence, appellant acquiesced in such substantial violations of the declarations and agreements that it now seeks to enforce that it waived any right to enforce them. *See Cowling*, 158 Tex. at 461–62, 312 S.W.2d at 945; *K.M. Van Zandt Land Co.*, 2008 WL 2510602, at *2. Although appellant contends in its brief that there is no proof of past violations of the declarations that may support waiver, appellant

[7]In its oral argument, appellant discussed the potential rights and concerns of the City and of Interlochen as "weigh[ing] against waiver in this case." We note, however, that neither the City nor Interlochen appeared in the trial court to seek enforcement of its agreements with the Joint Venture or with Coventry.

14

stated in its second amended petition that appellees had failed and refused to "comply with the terms of the Declaration," to "remit assessments to the [Homeowners] Association," and to "pay their pro-rata share of the cost of maintenance and operation of the items set out in the agreements with Interlochen and the City of Arlington." In fact, toward the end of its petition, appellant contended that "[a]s a result of [appellees'] failure and refusal to comply with the terms of the Declaration and the Agreements with Interlochen and [the City], it became necessary for [appellant] . . . to bring this action."

Similarly, in its response to appellees' motions for summary judgment, appellant alleged that appellees were benefitting from "the maintenance of the common areas, streets, alleyways, security fencing[,] and a gate by [appellant] without their having to pay fo[r] any of it" and that appellees had "failed to comply" with the provisions of Coventry's agreement with Interlochen. The trial court could have considered these judicial admissions about violations of the relevant restrictions, coupled with the evidence below that establishes appellant's long-term acquiescence in violations of the restrictions, in granting summary judgment for appellees based on waiver. *See Houston First Am. Sav. v. Musick*, 650 S.W.2d 764, 767 (Tex. 1983) ("Assertions of fact, not pled in the alternative, in the live pleadings of a party are regarded as formal judicial admissions. Any fact admitted is conclusively established in the case without the introduction of the pleadings or presentation of other evidence."); *see also* Tex. R. Civ. P. 166a(c) (stating that the trial court may consider the pleadings and admissions

15

on file when making its summary judgment decision); *Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 568 (Tex. 2001) (holding that a party's statement of fact in a summary judgment response qualified as a judicial admission that a trial court properly considered in granting summary judgment against the party); *Vaughn v. Hughes*, 917 S.W.2d 477, 480 (Tex. App.—Fort Worth 1996, no writ) (stating that it may be proper to grant a defendant's motion for summary judgment based on statements contained in a plaintiff's pleading); *Uniroyal, Inc. v. Vega*, 455 S.W.2d 783, 784 (Tex. Civ. App.—San Antonio 1970, no writ) ("A defendant's motion for summary judgment may rest upon a clear demonstration by the pleadings alone that the cause of action is barred, as a matter of law, by affirmative defenses . . . .").

Even without the judicial admissions, the record establishes that over a period of several years, appellant failed to attempt enforcement of restrictions on the lots excluded by the declarations. Appellee Russell Greene stated in an affidavit that his home was built in 1986; that for a period of almost fifteen years, appellant had not sought to enforce any restrictions against his home; and that appellants attempted to compel him to become a member of the Homeowners Association only after the parking dispute arose.[8] Similarly, Richard Harris and

_____

[8]Ridgeway, appellant's president from approximately 2006 through 2011, stated that the parking dispute arose in 2009.

16

Sterling Howard[9] swore in affidavits that in the fifteen years preceding 2010, they were never told that they would be required to become members of the Homeowners Association. Further, Ridgeway expressed in his affidavit that prior to 2009, with respect to the declarations, appellees had been "free to do as they like[d] without consequence." Finally, appellees' summary judgment evidence establishes that in 1993, JMH (whose president, Helzer, was later appellant's president) expressed to Harris and Howard, whose lots were excluded by the declarations, that they were not required to join the Homeowners Association.[10] The record does not reveal any attempt by appellant until 2009 to contradict JMH's expression in the 1993 letters by seeking to enforce restrictions on the lots now owned by appellees. *See Tenneco Inc.*, 925 S.W.2d at 643 (stating that waiver may be proved by inaction for a period long enough to show an intention to yield a known right); *see also Van*, 990 S.W.2d at 753 ("Once the movant produces evidence entitling it to summary judgment, the burden shifts to the nonmovant to present evidence that raises a fact issue.").

---

[9]Harris and Howard were two of the defendants that appellant originally sued along with appellees. Harris owns lot 29 of Block 2, and Howard owns lot 31 of Block 2. These lots, like appellees' lots, are excluded by the declarations.

[10]Harris and Howard stated in their affidavits that in 1993, they received letters from Barrington Management & Investment Corporation, which was JMH's agent. The letter to Harris, dated August 31, 1993, states in part, "We are in the process of creating a Homeowners Association for the subdivision. You are welcome to join the association but are not obligated to do so."

For all of these reasons, we hold that the trial court did not err by granting summary judgment for appellees because the record establishes as a matter of law that appellant waived any right to enforce provisions of the declarations and agreements at issue and waived any right to compel appellees to join the Homeowners Association. *See* Tex. R. Civ. P. 166a(c); *Tenneco Inc.*, 925 S.W.2d at 643; *Cowling*, 158 Tex. at 461–62, 312 S.W.2d at 945. Thus, we overrule appellant's second issue to the extent that appellant complains about the trial court's summary judgment decision based on waiver. Because we conclude that our resolution of that part of appellant's second issue is sufficient to affirm the trial court's summary judgment and is dispositive of the claims between the parties, we decline to address the remaining arguments in appellant's three issues. *See* Tex. R. App. P. 47.1; *City of Haltom City v. Aurell*, 380 S.W.3d 839, 859 n.17 (Tex. App.—Fort Worth 2012, no pet.); *Hanson*, 317 S.W.3d at 852.

## Conclusion

Having overruled a dispositive portion of appellant's second issue, we affirm the trial court's order granting summary judgment for appellees.


          TERRIE LIVINGSTON
          CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DELIVERED:  May 30, 2013